UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

DEA M. SHANDA,                                              CIVIL NO. 14-1838 (MJD/JSM)

       Plaintiff,

v.                                                         <u>REPORT AND RECOMMENDATION</u>

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

       Defendant.


This matter is before the Court upon the parties' cross-motions for summary judgment.  [Docket Nos. 8 and 10].  This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).  The matter has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

## I.    PROCEDURAL BACKGROUND

Plaintiff Dea Shanda ("Shanda") applied for disability insurance benefits ("DIB") on July 6, 2011.  (Tr. 30, 58).  Shanda alleged a disability onset date of July 1, 2009, as a result of knee, neck, and shoulder problems; bilateral knee degenerative joint disease; right shoulder impingement; right shoulder rotator cuff tear and repair; and chronic lower back pain with degenerative joint disease.  (Tr. 59, 160).  Shanda was last insured for Social Security benefits on September 30, 2013.  (Tr. 156).

The Social Security Administration ("SSA") denied Shanda's application for benefits on September 1, 2011, (Tr. 58-59, 63-65), and on reconsideration on December 6, 2011.  (Tr. 60-62, 71-72).  Shanda timely requested a hearing before an Administrative Law Judge ("ALJ") on December 12, 2011.  (Tr. 74-75).  On February 26,

2013, a hearing was held before ALJ Paul Gaughen.  (Tr. 13, 29-57).  Shanda was represented by Lionel Peabody, Esq.  (Tr. 30, 31).  Shanda testified at the hearing, as did James Parker, a vocational expert ("VE").  (Tr. 34-56).

On March 8, 2013, the ALJ issued his decision denying benefits.  (Tr. 13-22).  Shanda sought further review of the ALJ's decision by the Appeals Council.  (Tr. 7-9).  On April 30, 2014, the Appeals Council denied Shanda's request for review, making the ALJ's decision final.  (Tr. 1-3).

Shanda sought judicial review of the ALJ's decision by filing a Complaint pursuant to 42 U.S.C. § 405. [Docket No. 1].  The parties then filed cross-motions for summary judgment.  [Docket Nos. 8 and 10].

## II.   PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); 42 U.S.C. § 1382(a).  The SSA shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 1382c(a)(3)(A).  The claimant's impairments must be "of such severity that (the claimant) is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).  The impairment must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509.

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.907-09. A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929. To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience. See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727. The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, although review is not automatic. 20 C.F.R. §§ 404.967-404.982. The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within sixty days after notice of the Appeals Council's action. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981.

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of plaintiff's impairments.

6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

This Court's review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008); Johnson v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000). The Court "may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole." Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to

support the Commissioner's conclusion." Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004).  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.  Culbertson, 30 F.3d at 939.  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Act.  See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity.  See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).

## III.   DECISION UNDER REVIEW

The ALJ concluded that Shanda was not disabled within the meaning of SSA regulations during the relevant period between July 1, 2009, and September 30, 2013.

In support, the ALJ made the following determinations under the five-step disability evaluation process:

As step one, the ALJ determined that Shanda had not engaged in substantial gainful activity since July 1, 2009, the date of alleged disability onset. (Tr. 15). The ALJ noted that Shanda had worked 12 hours a week as a group home health aide until June, 2011, but her earnings were lower than the monthly threshold for substantial gainful activity. (Id., citing Tr. 144-55, 174-81).

At step two, the ALJ determined that Shanda had the following severe impairments: bilateral knee degenerative joint disease, status post right shoulder rotator cuff repair, cervical myelopathy, lumbar degenerative disk disease, and obesity. (Id.). The ALJ noted that the record reflected a diagnosis of bilateral carpal tunnel syndrome. However, the ALJ concluded that this condition caused no more than minimal limitations because Shanda had not sought treatment for carpal tunnel syndrome prior to 2013. (Tr. 16, citing Tr. 166-73, 478-82).

The ALJ also found that Shanda's alleged depression was non-severe because it caused no more than minimal limitation in her ability to perform basic mental work activities. (Id.). In reaching this determination, the ALJ considered the four broad functional areas used for evaluating mental disorders, known as the "paragraph B" criteria, as set forth in section 12.00(C) of 20 C.F.R. Pt. 404, Subpt. P, App. 1.[1] (Id.).

---

[1]     Section 12.00(C) provides:

> We measure severity according to the functional limitations imposed by your medically determinable mental impairment(s). We assess functional limitations using the four criteria in paragraph B of the listings: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Where we use "marked"

As to the first functional area, "activities of daily living," the ALJ found that Shanda had no limitation. In July, 2011, Shanda stated that she would run errands, exercise, cook, play games, do housework, shop twice a week, read books, and sew without any problems completing tasks or following directions. (Id., citing Tr. 166-73).

In the second functional area, "social functioning," the ALJ found that Shanda had no limitation because she did not allege any difficulties getting along with others or being in public. (Id.). In addition, Shanda reported spending time with people every week and visiting her parents in the nursing home. (Id., citing Tr. 166-73).

In the third functional area, "concentration, persistence or pace," the ALJ determined that Shanda had mild limitations. (Id.). Although Shanda alleged that she lost concentration after 30 minutes, she also stated that she could cook, do chores and shop, which indicated sufficient concentration for performing activities. (Id.). Shanda also reported losing over 50 pounds in one year, which also suggested sustained concentration. (Id.). In July, 2011, Shanda was able to walk her dog, run errands, cook, play games, perform light gardening, read and sew. (Id.). She denied any problems with memory, concentration, or completing tasks, and stated that she could handle moderate stress and changes in routine. (Tr. 16-17, citing Tr. 166-73).

---

as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis.

20 C.F.R. Pt. 404, Subpt. P, App. 1 (citation omitted).

As to the fourth functional area, "episodes of decompensation," the ALJ found that Shanda had experienced no episodes of decompensation of extended duration and had not required emergent psychiatric care.  (Tr. 17).

Because Shanda's medically determinable mental impairment of depression caused no more than "mild" limitations in the first three functional areas, and no episodes of decompensation in the fourth area, the ALJ concluded that Shanda's depression was non-severe.  (Id., citing 20 C.F.R. § 404.1520a(d)(1)).

Lastly, the ALJ noted that Shanda had alleged disability from post-traumatic stress disorder ("PTSD").  However, because Shanda had not been diagnosed with PTSD by an acceptable medical source, and because the record contained no mental status examinations or clinical observations indicating such a condition, the ALJ concluded that PTSD was not a medically determinable impairment.  (Id., citing Tr. 467).

At step three of the disability evaluation process, the ALJ determined that Shanda's symptoms did not meet or medically equal the severity of one of the presumptively disabling impairments listed in 20 C.F.R. Part 404, Subpt. P, App. 1. (Id., citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  In particular, the ALJ found that Shanda's impairments did not meet Listing 1.02 (Major Dysfunction of a Joint) or Listing 1.04 (Disorders of the Spine).  (Id.).

With respect to Shanda's obesity, the ALJ found that Shanda's obesity did not meet or equal a listed disorder because the evidence did not demonstrate that the combination of Shanda's bilateral knee degerative joint disease, status post right shoulder rotator cuff repair, cervical myelopathy, lumbar degenerative disk disease, and obesity resulted in sufficiently severe limitations.  (Tr. 18).

8

At step four of the disability evaluation process, the ALJ determined that Shanda had the following residual functional capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can be on the feet standing and walking up to 2 hours total and sitting 6 hours total in an 8-hour workday.  If she has a lunch break to split the shift and short breaks after every second hour, she can sit unrestricted.  If she spends two hours on the feet, the balance of the workday can be performed in a seated position.  She is limited to less than occasional bending, kneeling, stooping, and vigorous twisting of the body from side to side for up to 10 percent of the workday. She can occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, and continuously handle 5 pounds if lifted up to chest height.  With the dominant right arm, she can lift overhead no more than 3 pounds briefly for less than 1/3 of the workday, but is not impaired in the bilateral upper extremities in gripping, fingering, moving in all directions, or frequently extending in front of the body.

(Id.).

Based on all of the evidence, the ALJ concluded that Shanda's medically determinable impairments could reasonably be expected to cause her alleged symptoms.   However, he did not credit Shanda's statements as to the intensity, persistence and limiting effects of her impairments.  (Tr. 19).

With respect to Shanda's pain, the ALJ found that the medical evidence and treatment history did not support the severity of limitations alleged by Shanda.  (Id.).  In support, the ALJ summarized the records as follows: Shanda underwent a right shoulder rotator cuff repair in May, 2009, and presented with knee soreness in July, 2009.  (Id., citing Tr. 221, 339).  In October, 2009, orthopedist Dr. William Schnell noted Shanda's "excellent strength with external and internal rotation, slightly tender AC joint, and mildly restricted range of motion of the shoulder."  (Id., citing Tr. 255).   In

September, 2010, bilateral knee MRI scans indicated grade 4-5 chondromalacia patella[2] in the both knees.  (Id., citing Tr. 214-17, 254).  Dr. Schnell performed arthroscopic meniscectomies on both knees in October and December, 2010.  (Id., citing Tr. 237, 239).  In March, 2011, Shanda exhibited painless full range of motion and excellent strength in the right shoulder.  (Id., citing Tr. 247).  However, Shanda showed severely limited range of motion in her back, and a lumbar MRI revealed mild to moderate degenerative disk disease.  (Id., citing Tr. 234, 247).  In July, 2011, Dr. Schnell noted mildly warm knees, with diminished range of motion and osteoarthritic changes in both knees.  (Id., citing Tr. 401).  Nevertheless, Dr. Schnell determined that surgery was not warranted and recommended continued weight loss and observation of symptoms. (Id.).  In August, 2011, Dr. Hal Heyer observed that Shanda needed a cane to walk, but he also noted that Shanda found great relief and improvement in her knees following steroid injections.  (Id., citing Tr. 468).  In September, 2011, Dr. Schnell diagnosed Shanda with significant bilateral patellofemoral crepitus[3] with tender medial and lateral joint lines, and recommended continued exercise rehabilitation.  (Id., citing Tr. 402).  In March, 2012, Dr. Heyer noted Shanda's weight loss of 40 pounds, non-use of a cane, improved bilateral weakness, and slightly limited range of motion.  (Id., citing Tr. 469). In December, 2012, Dr. James Donovan noted a 53-pound weight loss over the year and a BMI of 37.73.  (Id., citing Tr. 470).  In February, 2013, Dr. Daniel Wallerstein, observed limited cervical range of motion, minimally limited shoulder flexion, mild to

---

[2]      Chondromalacia patella is a "softening of the articular cartilage of the patella; may cause patellalgia."     Stedman's Medical Dictionary 341 (27th ed. 2000) ("Stedman's").

[3]      Crepitus refers to "the grating of a joint, often in association with osteoarthritis." Stedman's at 424.

moderately limited shoulder abduction, mildly limited lumbar extension and mobility, mild balance instability while changing direction, smooth gait, negative straight leg raise, and no significant weakness or sensory deficits.  (Tr. 19-20, citing Tr. 478-82).

According to the ALJ, Shanda's treatment history indicated improvement of symptoms after surgery, physical therapy, steroid injections, and weight loss.  (Tr. 20). Specifically, the ALJ noted that in September, 2009, Shanda exhibited nearly full passive range of motion in the right shoulder after 31 physical therapy sessions.  (Id., citing Tr. 349).  Shanda did not return to Dr. Schnell until September, 2010.  (Id., citing Tr. 244).  In February, 2011, Shanda was discharged from physical therapy for her knees after meeting most of her goals and exhibiting minimal complaints of pain.  (Id., citing Tr. 361).  In July, 2011, Dr. Schnell advised against surgery, and Shanda was discharged from physical therapy for her neck and back pain after meeting all goals. (Id., citing Tr. 369, 372, 401).  After experiencing a fall, Shanda attended physical therapy from April to August, 2012, for lower back, neck and shoulder pain, and received two lumbar steroid injections in March and July, 2012; upon discharge, Shanda reported feeling much better and exhibited improved exercise.  (Id., citing Tr. 417, 418-19, 469).  At the hearing, Shanda admitted that her pain improved after losing weight and taking ibuprofen.  (Id.).

The ALJ found inconsistencies in Shanda's work history and daily activities. Shanda continued to work 12 hours a week as a home health aide until June, 2011, two years after the alleged disability onset date.  (Id., citing Tr. 144-55).  In her work as a home health aide, Shanda cooked, cleaned, did laundry, and assisted clients with bathing and dressing 2-3 times per shift, which required lifting clients weighing more

than 100 pounds.  (Id., citing Tr. 175).   Shanda also reported working at home and taking computer courses until injuring her shoulder in September, 2010.  (Id., citing Tr. 478-82).   However, the ALJ noted that the record lacked any complaints of a shoulder injury around September, 2010, that would have affected Shanda's ability to use her arms.  (Id., citing Tr. 222-24, 254-55).

With regard to activities of daily living, Shanda reported cooking, shopping, housekeeping, sewing, reading, playing games, doing laundry and light gardening, walking the dog up to six blocks, and visiting her parents in the nursing home.  (Id., citing Tr. 166-73).   Although Shanda previously used a cane, she no longer required one by March, 2012.  (Id.).   As of late 2012, Shanda reported walking her dog 30 minutes a day and exercising with weights.  (Id., citing Tr. 455, 470).

The ALJ stated that he had accounted for Shanda's obesity, cervical myelopathy, bilateral knee degenerative joint disease, and lumbar degenerative disk disease by limiting Shanda to "a range of light exertion work in which she can stand and walk up to 2 hours total in an 8-hour workday but can only bend, kneel, stoop, and vigorously twist the body from side to side for up to 10 percent of the workday."  (Id.).   The ALJ further indicated that, because of her status post right shoulder rotator cuff repair, Shanda could lift overhead with the dominant right arm no more than 3 pounds briefly for less than 1/3 of the workday.  (Id.).

The ALJ gave significant weight to Dr. Schnell, who recommended that Shanda return to work without restriction after her right shoulder and bilateral knee surgeries because this opinion was consistent with Dr. Schnell's examinations and Shanda's treatment history and activities of daily living.  (Tr. 20-21, citing Tr. 248, 255).

With regard to Shanda's primary physician, Dr. Viren, who had concluded that Shanda was "'disabled by her pain'" in July, 2011, the ALJ assigned her opinion little weight because she had failed to cite any objective clinical findings to support her opinion, and it was inconsistent with Shanda's documented improvement after physical therapy and lumbar steroid injections.  (Tr. 21, citing Tr. 229).

The ALJ afforded great weight to Dr. Wallerstein's opinion that Shanda could "stand up to 2 hours total, sit the balance of the workday, and lift up to 20 pounds occasionally," because this finding was consistent with Dr. Wallerstein's "generally minimal examination findings" and Shanda's daily activities.  However, the ALJ gave little weight to Dr. Wallerstein's opinion that Shanda could only work 4 to 6 hours a day, with 2 to 3 minute breaks every 30 minutes to stretch.  (Id., citing Tr. 478-82). According to the ALJ, this opinion was inconsistent with Dr. Wallerstein's examinations and the record as a whole.  (Id., citing Tr. 478-82).

The ALJ assigned little weight to the opinion of treating therapist Dana Fromberg, LICSW, that Shanda was unable to sustain competitive employment due to the risk of experiencing anhedonia, fatigue, irritability and hypervigilance because it was not supported by treatment notes or mental status examinations and was internally inconsistent with Fromberg's description of Shanda as pleasant, flexible, and persistent. (Id., citing Tr. 467).

The ALJ also granted little weight to the State Agency psychological consultants who found that Shanda had no medically determinable mental impairment, as newer evidence supported a medically determinable impairment of depression.  (Id., citing 407-09).

As for the State Agency medical consultants' opinions that Shanda was capable of the range of light work, with the ability to stand and walk at least two hours and occasionally lift overhead with the right arm, the ALJ assigned them persuasive weight. (Id., citing Tr. 378-85, 403-07).  The ALJ noted that, although these consultants did not examine Shanda, their opinions were consistent with the findings of Shanda's treating sources, as well as Shanda's testimony and activities of daily living.  (Id.).

In sum, the ALJ concluded that the RFC assessment was supported by Shanda's work history, activities of daily living, examinations and documented improvement from physical therapy, improved pain from weight loss, and the opinions of Dr. Schnell and the State Agency medical consultants.  (Id.).

At the fourth step of the disability evaluation process, the ALJ determined that Shanda was capable of performing past work as a computer-aided drafter because this job was not precluded by Shanda's RFC.  (Tr. 22).  The ALJ noted that the VE had opined that a person of Shanda's age, education, work experience and RFC could perform Shanda's past work as a computer-aided drafter because such work was consistent with Shanda's limitations of fingering, gripping, and extension away from the body.  (Id.).  According to the ALJ, the testimony of the VE was highly credible and consistent with Dictionary of Occupational Titles.  (Id.).  The ALJ further noted that Shanda could perform the work of a computer-aided drafter as actually and generally performed.  (Id.).

For all of these reasons, the ALJ concluded that Shanda was not disabled for the period of July 1, 2009 through March 8, 2013.  (Id.).

## IV.    THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

### A.    Shanda's Motion for Summary Judgment

In support of her motion for summary judgment, Shanda argued that the ALJ's RFC assessment failed to include the limitations in reaching and concentration shown by the record, and therefore, the VE's testimony was not substantial evidence supporting the Commissioner's denial of benefits.   Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Pl.'s Mem."), p. 18 [Docket No. 9].   Shanda noted that under the ALJ's findings, she must be found disabled if she cannot perform her past work as a computer assisted drafter.   Id., p. 19.

With respect to limitations in reaching, Shanda contended that the ALJ failed to mention Dr. Wallerstein's opinion that she could not perform frequent, repetitive or prolonged reaching away from her body, and did not give any reason why that opinion should be ignored.   Id., p. 20.   Shanda also asserted that the ALJ ignored the opinions of the State Agency medical consultants who found that reaching in all directions was limited, and use of the right arm for repetitive reaching was limited to occasional.   Id., p. 21.   Shanda further submitted that although the ALJ claimed he gave significant weight to the opinion of Dr. Schnell—who released Shanda to work without restriction following her shoulder and knee surgeries—the RFC assessment contained significant restrictions that were directly contrary to Dr. Schnell's opinions.   Id.

As to concentration, Shanda submitted that the ALJ should have given more weight to Dr. Viren's opinion that Shanda could not sit for any period of time because of back pain.   Id., pp. 22-23.   Although the ALJ claimed that there were no objective findings to support Dr. Viren's opinion, physical therapy notes indicated continued

15

shoulder pain.  Id., p. 23 (citing Tr. 268, 276).   In addition, Dr. Viren was Shanda's treating primary care provider who had access to Shanda's entire medical record and made referrals to physical therapy.  Id.

Shanda also claimed that the ALJ's decision to give little weight to Dr. Wallerstein's opinion that Shanda could work only 4 to 6 hours a day with 2 to 3 minute stretch breaks every 30 minutes—as it was inconsistent with Dr. Wallerstein's examinations and the record as a whole—should not be upheld because the ALJ failed to specify which part of the examination or the record as whole he relied upon in making that determination.  Id.  Shanda further noted that Dr. Viren had referred Shanda to Dr. Wallerstein because of his expertise in assessing physical restrictions.  Id. (citing Tr. 476).

Lastly, Shanda contended that the ALJ failed to consider the combined effect of her physical and mental impairments (depression) on her ability to sustain the concentration necessary to perform work as a computer-aided drafter.  Id., p. 24.

### B.   Commissioner's Motion for Summary Judgment

The Commissioner argued that Shanda's manipulative limitations, to the extent they were supported by the record, were properly evaluated in the RFC assessment by the ALJ.   Defendant's Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem."), p. 6 [Docket No. 11].

The Commissioner disagreed with Shanda's interpretation of the opinion of State Agency medical consultant Dr. Anderson, who stated that Shanda should limit right arm "'overhead lifting and repetitive reaching to occasional.'"  Id., p. 7 (citing Tr. 381).  While Shanda contended that Dr. Anderson had limited repetitive reaching in all directions, the

Commissioner submitted that word "overhead" applied to both lifting and reaching limitations.  Id.  As such, the ALJ's conclusion that Shanda could frequently extend her right arm in front of her body was consistent with Dr. Anderson's opinion.  Id. (citing Tr. 18).

The Commissioner also contended that the ALJ properly considered the opinion of Dr. Wallerstein.  Id., pp. 7-8.  The Commissioner admitted that the ALJ failed to address Dr. Wallerstein's statement that Shanda could not perform frequent, prolonged, or repetitive reaching away from her body.  Id.  However, the Commissioner asserted that it was clear from the ALJ's decision that he did not give weight to this portion of Dr. Wallerstein's opinion, and, in any event, substantial evidence supported the ALJ's conclusion that Shanda was limited only in her ability to reach overhead.  Id., pp. 8-9.

As to limitations on concentration, the Commissioner maintained that the ALJ correctly determined that Shanda was able to work if she had one lunch break and short breaks every second hour.  Id., p. 9 (citing Tr. 18).  According to the Commissioner, the ALJ properly discounted Dr. Viren's conclusory opinion that Shanda was disabled by her pain, as this opinion was based on Shanda's own subjective complaints.  Id., p. 10 (citing Tr. 21, 229).  The Commissioner further asserted that Shanda's alleged limitations in concentration were controverted by the record.  Id., pp. 10-11.

Finally, the Commissioner argued that the ALJ correctly found that Shanda's medically determinable impairment of depression was non-severe because Shanda did not seek treatment for depression until recently, and such limitations were at odds with Shanda's activities of daily living and her own testimony.  Id., pp. 11-12.

B.    **Shanda's Reply**

In reply, Shanda argued that the Commissioner misread the opinion of Dr. Anderson with respect to Shanda's limitations in reaching.   Plaintiff's Reply to Defendant's Memorandum in Support of Summary Judgment ("Pl's. Reply"), pp. 4-5 [Docket No. 12].  Shanda maintained that Dr. Anderson had limited repetitive reaching in all directions, not merely overhead, as this limitation was consistent with the opinion of Dr. Wallerstein and the record as a whole.  Id. (citing Tr. 481).

As to the Commissioner's assertion that substantial evidence supported the ALJ's rejection of Dr. Wallerstein's manipulative limitations, Shanda contended that the ALJ did not make this argument, and the Court cannot adopt the Commissioner's post-hoc rationalizations for the ALJ's actions.  Id., p. 6 (citations omitted).   In addition, Shanda argued that her daily activities, medical evidence, and work history were not inconsistent with Dr. Wallerstein's opinion and did not show that Shanda could perform past work as a computer-aided drafter.  Id., pp. 6-8.

With respect to concentration, Shanda pointed to her testimony and evidence in the record that showed that she could not maintain the high level of focus and concentration necessary to work as a computer-aided drafter.  Id., pp. 8-12.  She asserted that her testimony—that she could not sit in a chair long enough to maintain her concentration because of the pain in her back, knee and leg; she did not sleep well because of the pain, and was thus fatigued; and she had been having problems with depression for some time—was all supported by the opinions of Dr. Viren, Dr. Wallerstein, and the medical and physical therapy records.  Id., pp. 10-12.  Although the ALJ found that Shanda's medically determinable impairment of depression was non-

severe, Shanda argued that the ALJ was required to consider how her depression—along with her severe physical impairments to the knees, right shoulder, cervical and lumbar spine, and obesity, alone or in combination—affected her ability to sustain the level of concentration required for computer-aided drafting. Id., pp. 12-14. As for the Commissioner's reliance on the ALJ's discussion of her ability engage in a variety of daily activities to support his assessment of her ability to concentrate, Shanda maintained that her ability to cook, do chores and shop did not require the high level of concentration required to perform computer-aided drafting and, therefore, were not probative of her ability to perform such work. Id., p. 13.

## V. RELEVANT MEDICAL AND PSYCHOLOGICAL HISTORY

### A. Medical Evidence

#### 1. Right Shoulder Pain

On December 31, 2008, Shanda had an appointment with Dr. Howard Y. Josephs. (Tr. 218). Shanda told Dr. Josephs that she had fallen on the ice the previous day and had hyperextended her right shoulder. (Id.). After the fall, Shanda had experienced increasing pain and difficulty using her right shoulder. (Id.). Upon examination, Dr. Josephs found no obvious deformities or bruising in Shanda's right shoulder, but he noted tenderness over the subacromial[4] bursa and acromioclavicular ("AC") joint. (Id.). Internal and external rotation of the shoulder was limited to about 15 degrees, and Shanda was unable to abduct her arm due to discomfort. (Id.).

---

[4] The "acromion" refers to the "lateral end of the spine of the scapula which projects as a broad flattened process overhanging the glenoid fossa" (i.e. the point of the shoulder). Stedman's at 18.

Dr. Frank Suslavich took an x-ray of Shanda's right shoulder.  (Tr. 231).  Dr. Suslavich found normal alignment of the shoulder and an intact humerus.  (Id.).  Dr. Josephs reviewed the x-rays and found no fractures, but he noted some mild arthritis of the AC joint.  (Tr. 218).  Dr. Josephs diagnosed Shanda with a tendon injury and possible brief dislocation.  (Id.).  Dr. Josephs placed Shanda's shoulder in a sling and referred her to physical therapy.  (Id.).

On January 5, 2009, physical therapist Greg Ruberg completed an initial evaluation of Shanda with respect to her right shoulder injury.  (Tr. 306-07).  Ruberg noted that Shanda had experienced significant pain for the first three days after the fall but had exhibited some improvement recently, including increased range of motion, decreased need for pain medications, and decreased use of a sling.  (Tr. 306).  Shanda rated her pain as 1/10 when not moving her arm and 5 or 6/10 on average.  (Id.).  She also reported difficulty sleeping because of pain.  (Id.).  Shanda described the pain as extending down to her elbow with no hand numbness, tingling, or weakness.  (Id.).  Shanda also complained of some left-side neck pain.  (Id.).  After physical examination and range of motion exercises, Ruberg diagnosed Shanda with a right shoulder impingement.  (Id.).  Ruberg noted that Shanda had been treating her symptoms adequately at home with ice packs, over-the-counter medications, and rest.  (Id.).

On February 2, 2009, after nine physical therapy sessions, Ruberg noted that Shanda's pain had decreased to a 1 or 2/10 but that she was still struggling to sleep on her right shoulder.  (Tr. 301).  Ruberg indicated that Shanda continued to take anti-inflammatory medication before bed and was engaging in a home exercise program.  (Id.).  A manual muscle test of Shanda's right shoulder revealed minimal soreness with

resistance.   (Id.).   Ruberg scheduled no further physical therapy sessions and recommended that Shanda continue her independent home exercise program.   (Id.).

On February 25, 2009, Shanda saw Dr. Debbie A. Allert because of recurrent discomfort in her right shoulder, particularly when reaching forward or "doing things where she has to put pressure on her shoulder, such as with mopping."   (Tr. 219). Shanda also reported discomfort when sitting at a computer for too long.   (Id.).   Dr. Allert observed full range of motion in Shanda's neck but some tightness over the right trapezius.   (Id.).   Shanda showed discomfort with external and internal rotation of the arm, as well as mild discomfort with strength testing on external and internal rotation. (Id.).   Shanda also exhibited a positive Neer's test[5] on the right side.   (Id.).   Dr. Allert diagnosed Shanda with possible tendonitis or a labral[6] tear.   (Id.).   Dr. Allert recommended additional physical therapy and a possible steroid injection.   (Id.). Shanda declined the steroid injection at that time.   (Id.).

On March 2, 2009, Shanda attended a physical therapy session with Ruberg. (Tr. 298-300).   Shanda told Ruberg that her shoulder pain had improved significantly after the first round of physical therapy but that her pain worsened after spending increased time on her computer.   (Tr. 298).   Shanda rated her pain at about a 1 or 2/10 at rest, and a 7 or 8/10 at its worst.   (Id.).   Shanda reported muscle tension throughout the right shoulder area and into the neck.   (Id.).   She described her pain as spreading down to the wrist of her right hand, with no numbness, tingling, or neurological

---

[5]    Neer's test is used to diagnose subacromial impingement.   Thomas W. Woodward, M.D., and Thomas M. Best, M.D., Ph.D., The Painful Shoulder: Part I. Clinical Evaluation, American Family Physician (May 15, 2000), http://www.aafp.org/afp/2000/0515/p3079.html.

[6]    A labrum is a "fibrocartilaginous lip around the margin of the concave portion of some joints."   Stedman's at 957.

weakness.  (Id.).   Upon examination, Shanda exhibited a positive Neer's test, and Ruberg diagnosed her with "right shoulder impingement and rotator cuff tendinitis from scapular instability and increased use of a computer."  (Id.).

On April 3, 2009, after ten sessions, Shanda was discharged from physical therapy.  (Tr. 293).  Ruberg indicated that Shanda was still experiencing impingement-type pain in the right shoulder, "especially at end range of flexion and horizontal abduction."  (Id.).   Ruberg noted that Shanda was scheduled for surgery at the end of May, 2009, and that she would continue a home exercise program until that time.  (Id.).

On April 8, 2009, Shanda saw Dr. Schnell for an examination of her right shoulder.  (Tr. 261).  Dr. Schnell found that "[t]he anterior aspect of [Shanda's] shoulder sometimes is sharp, sometimes dull aching pain."  (Id.).  Shanda exhibited full range of motion in the shoulder, but Dr. Schnell noted tenderness over the rotator cuff insertion. (Id.).  An x-ray of Shanda's shoulder revealed mild degenerative joint narrowing.  (Id.). Dr. Schnell ruled out a rotator cuff tear and ordered an MRI of the right shoulder.  (Id.).

On April 15, 2009, an MRI of Shanda's right shoulder showed severe tendinopathy of the rotator cuff as a result of anterior hooking of the acromion and distal clavicle impingement.   (Tr. 260, 267).   Dr. Schnell recommended a diagnostic arthroscopy, arthroscopic acromioplasty with distal clavicle excision, and possible rotator cuff repair.  (Tr. 260).

On April 26, 2009, Dr. Schnell operated on Shanda's right shoulder.   (Tr. 241-42).  Dr. Schnell performed an arthroscopic shoulder debridement of a full-thickness rotator cuff tear, Bankart repair, acromioplasty with distal clavicle excision, and

arthroscopic right rotator cuff repair.  (Tr. 241).  The postoperative diagnosis was a Bankart tear,[7] rotator cuff tear, and AC joint dysarthrosis.[8]  (Id.).

On June 3, 2009, Shanda returned to Dr. Schnell for a recheck of her right shoulder.  (Tr. 259).  Dr. Schnell found that Shanda's surgical incisions were healing with no sign of infection and satisfactory range of motion.  (Id.).  Dr. Schnell noted that Shanda would begin outpatient physical therapy.  (Id.).

On June 4, 2009, Shanda saw Ruberg for a physical therapy session.  (Tr. 289-90).  Shanda reported some tingling into the hand and posterior neck pain along the cervical spine, but Ruberg suspected this may have been caused by wearing a sling. (Tr. 289).  Ruberg found that Shanda was doing well following her surgery, had good range of motion, minimal complaints of pain, and limited capsular tightness.  (Id.).

On July 1, 2009, Shanda had a right shoulder follow-up appointment with Dr. Schnell.  (Tr. 258).  Dr. Schnell noted excellent internal and external rotation strength and opined that Shanda was doing well.  (Id.).  Dr. Schnell indicated that Shanda could "[r]eturn to work, light duty on the 13th."  (Id.).

On August 12, 2009, Shanda saw Dr. Schnell following an altercation with a dog which caused Shanda to fall and injure her right shoulder.  (Tr. 257).  Upon examination, Shanda exhibited lack of full forward elevation and full external rotation, as well as diminished range of motion.  (Id.).  Dr. Schnell advised Shanda to continue her physical therapy program and noted that she should not yet return to work.  (Id.).

---

[7]     A Bankart tear is a type of tear in the labrum, which is "the attachment site for the ligaments [that] supports the ball and socket joint [of the shoulder] along with the rotator cuff tendons and muscles."  Stephen Fealy, M.D., Shoulder Labrum Tears: An Overview, Hospital for Special Surgery (Nov. 23, 2010), http://www.hss.edu/conditions_shoulder-labrum-tears-overview.asp#.VTE0WJNmomI.

[8]     Dysarthrosis is a "[m]alformation of a joint."  Stedman's at 550.

On September 21, 2009, Shanda was discharged from physical therapy after 31 sessions.  (Tr. 276, 349).  Shanda continued to have pain over the right distal clavicle during most resistance exercises and at the end range of all range-of-motion exercises.  (Id.).  Shanda rated her pain as a 3/10 on average, and 5 to 6/10 upon waking up in the morning.  (Id.).  She demonstrated nearly full passive range of motion.  (Id.).  Ruberg advised Shanda to continue her independent home exercise program.  (Id.).  Ruberg also indicated that Shanda had not met Short Term Goal #3, which provided:  "Patient to sleep 5-6 hours without waking secondary to right shoulder pain.  Time frame 2 weeks."  (Tr. 289).

On September 23, 2009, Shanda visited Dr. Schnell for a right shoulder recheck.  (Tr. 256).  On examination, Shanda exhibited tenderness over the AC joint portal, but had excellent range of motion and rotational strength.  (Id.).  Dr. Schnell recommended that Shanda refrain from work activity.  (Id.).

On October 28, 2009, Shanda showed mild restriction in range of motion and AC joint tenderness, but excellent strength with external and internal rotation.  (Tr. 255).  Dr. Schnell opined that Shanda was doing well and advised that she could return to work on December 16, 2009, without restrictions.  (Id.).

More than a year later, on March 28, 2011, Dr. Schnell noted full painless range of motion in the right shoulder, moderate pain with movement in the left shoulder, and excellent strength on both sides.  (Tr. 247).

### 2.    Knee Pain

On September 1, 2010, Shanda saw Dr. Schnell for an evaluation of her left knee.  (Tr. 254).  Shanda told Dr. Schnell that she had been knocked down by a dog

24

and had fallen on her left knee.  (Id.).  An x-ray of Shanda's left knee showed "mild osteoarthritis with mild spurring at the medial and lateral joint surfaces and at the patellofemoral joint.  No fractures or dislocations seen."  (Tr. 232).  Dr. Schnell performed a physical examination and found that Shanda was suffering from an "internal derangement as a result of injury a year ago."  (Tr. 254).  Dr. Schnell ordered an MRI of Shanda's left knee.  (Id.).

The MRI was conducted on September 3, 2010.  (Tr. 214-15).  According to Dr. Schnell, the MRI showed "a significant tear of the posterior horn of the medial meniscus[9] along with significant patellofemoral chondromalacia."[10]  (Tr. 253).  Dr. Schnell recommended surgery.  (Id.).

On October 12, 2010, Dr. Schnell performed an arthroscopic partial medial meniscectomy and debridement[11] on Shanda's left knee.  (Tr. 239-40).  The postoperative diagnosis was "[d]egenerative medial meniscus tear, grade III wear of medial femoral condyle and grade IV wear of patellofemoral joint – left knee."  (Tr. 239).

Shanda returned to Dr. Schnell on October 25, 2010, for a recheck of her left knee.  (Tr. 252).  Dr. Schnell noted that Shanda's incisions had healed and her calf and thigh were nontender.  (Id.).  He advised Shanda that she could gradually resume normal activity except for work.  (Id.).

---

[9]     The medial meniscus is a "crescent-shaped intraarticular cartilage of the knee joint attached to the medial border of the upper articular surface of the tibia, occupying the space surrounding the contacting surfaces of the femur and tibia."  Stedman's at 1092.

[10]     Chondromalacia refers to a softening of the cartilage.  Id. at 340.

[11]     Debridement is the "[e]xcision of devitalized tissue and foreign matter from a wound."  Stedman's at 460.

On November 10, 2010, Shanda exhibited range of motion with some full extension to deep flexion.  (Tr. 251).  Dr. Schnell opined that Shanda was doing well and could gradually resume her normal activity.  (Id.).

On November 17, 2010, Shanda told Dr. Schnell that her right leg had been clicking and snapping.  (Tr. 250).  An MRI of Shanda's right knee on November 18, 2010 revealed chondromalacia patella with articular cartilage erosion.  (Tr. 216-17).

On December 14, 2010, Dr. Schnell performed an arthroscopic meniscectomy and debridement on Shanda's right knee.  (Tr. 237-38).

On December 22, 2010, Shanda visited Dr. Schnell for a follow-up on her right knee surgery.  (Tr. 249).  Dr. Schnell noted that Shanda was doing well and recommended outpatient physical therapy.  (Id.).

Shanda attended her first physical therapy session with Ruberg on December 27, 2010, with Ruberg.  (Tr. 332-33).  Ruberg noted that Shanda demonstrated decreased range of motion, general weakness, and poor flexibility in her left and right lower extremities following her arthroscopy.  (Tr. 332).  Ruberg rated Shanda's rehabilitation potential as fair to good, depending on compliance.  (Id.).

On January 19, 2011, Shanda followed up with Dr. Schnell on her bilateral arthroscopies.  (Tr. 248).  Dr. Schnell opined that Shanda could return to work without restrictions.  (Id.).

On January 24, 2011, Shanda had a left knee physical therapy session with Ruberg.  (Tr. 326-27).  Ruberg noted that Shanda had decreased range of motion, weakness, and pain in the left knee.  (Tr. 326).  Ruberg assessed Shanda's rehabilitation potential as good.  (Id.).

Shanda was discharged from physical therapy on February 23, 2011.  (Tr. 323, 361).  In his discharge report, Ruberg indicated that Shanda had minimal complaints of pain during her last session and was engaging in an independent home exercise program.  (Id.).

Shanda received nine physical therapy sessions from April 26, 2011 through June 1, 2011.  (Tr. 309, 372).

On July 13, 2011, Dr. Schnell noted that Shanda's knees were mildly warm to the touch, with diminished range of motion.  (Tr. 243, 401).  Dr. Schnell found osteoarthritic changes in both knees, worse on the right than the left.  (Id.).  However, Shanda exhibited no operative findings, and Dr. Schnell recommended that Shanda continue with weight loss management.  (Id.).

On July 25, 2011, physical therapist Katie Klessig indicated that Shanda felt she could manage her symptoms independently.  (Id.).  Klessig noted that Shanda was able to complete 30 minutes of therapeutic exercise with minimal or no pain.  (Id.).  However, Shanda was unable to complete an elliptical exercise due to knee pain.  (Id.).  Klessig opined that Shanda's physical therapy goals had been met.  (Id.).

On August 3, 2011, Shanda saw Dr. Viren and complained of ongoing knee pain and difficulty sleeping.  (Tr. 373, 420).  Dr. Viren prescribed pain medication and noted that Shanda should seek a second opinion from orthopedics.  (Id.).  Dr. Viren also discussed with Shanda the possibility of weight loss surgery.  (Id.).

On September 21, 2011, Shanda met with Dr. Schnell for a recheck of her knees.  (Tr. 400, 402).  Dr. Schnell indicated that Shanda was significantly overweight and suffered from significant bilateral patellofemoral crepitus.  (Id.).  Dr. Schnell advised

continuation of the home exercise regime and "use of a bilateral pull-up knee sleeve with hinges." (Id.).

### 3.    Neck, Back, and Hip Pain

On February 14, 2011, Shanda reported pain in her left hip and was examined by Dr. Viren.  (Tr. 224).  Shanda stated that she felt pain from her left posterior buttock radiating around into her groin. (Id.).  Dr. Viren noted some tenderness in Shanda's left posterior buttock and discomfort with external rotation of the hip.  (Id.).  X-rays of Shanda's left hip revealed "[n]o significant degenerative changes," (Tr. 233, 322), and Dr. Viren found "no obvious bony abnormality."  (Tr. 224).  Dr. Viren recommended physical therapy.  (Tr. 224).

On February 16, 2011, Shanda attended a physical therapy session with Klessig. (Tr. 320-21).  Shanda rated her pain as a 6 or 7/10, and noted an increase in pain after walking more than 2 to 3 blocks or after any "static standing."  (Id.).  Upon physical examination, Shanda demonstrated normal range of motion and normal overall strength in the lower extremities. (Id.).  However, Shanda experienced a "slight pulling sensation with end range extension into the left SI region,"[12] as well as "pain with palpation over the left SI region . . . ." (Id.).  Klessig diagnosed Shanda with a "left SI dysfunction" and recommended further physical therapy sessions and a home exercise program.  (Id.).

On March 28, 2011, Shanda visited Dr. Schnell for an evaluation of her left hip. (Tr. 247).  Dr. Schnell noted that Shanda's AC joint was tender, and her back range of

---

[12]    SI refers to the sacroiliac joint, which is "the place where the sacrum and the iliac bones join. . . . The main purpose of the joint is to connect the spine and the pelvis." U.S. National Library of Medicine, Sacroiliac joint pain – aftercare, MedLinePlus, http://www.nlm.nih.gov/medlineplus/ency/patientinstructions/000610.htm  (last  updated Aug. 25, 2012).

motion was severely limited.  (Id.).  Shanda demonstrate full range of motion in the hips,

but some pain in the left hip.  (Id.).  X-rays of Shanda's hips revealed no fractures, loose

bodies, dislocation, or significant degenerative joint disease.  (Id.).  X-rays of the lumbar

spine showed mild degenerative lumbar narrowing.  (Id.).  Dr. Schnell diagnosed

Shanda with degenerative lumbar disk disease and ordered an MRI of the lumbar spine.

(Id.).

On April 5, 2011, an MRI of Shanda's lumbar spine revealed "[m]ild to moderate

degenerative disc disease at L4-5 with moderate narrowing of the left lateral

recess . . . ."  (Tr. 234-35).  Dr. Schnell recommended a corticosteroid injection.  (Tr.

246).

On April 19, 2011, Shanda saw Dr. Viren for a complete physical.  (Tr. 226-28).

Shanda reported having some left side neck pain, but Dr. Viren found no adenopathy[13]

or thyromegaly.[14]  (Tr. 227).

On April 26, 2011, Shanda attended a physical therapy session for her left neck

pain.  (Tr. 313-14).  Klessig assessed Shanda with left upper back and neck myofascial

type pain.  (Tr. 313).  Klessig recommended further physical therapy and an

independent exercise program.  (Id.).

On May 2, 2011, Shanda was seen by Dr. Heyer for a lumbar epidural steroid

injection.  (Tr. 236).  Dr. Heyer noted that Shanda had markedly limited range of motion,

impacted gait, and weakness bilaterally.  (Id.).  After considering the risks and benefits

of the procedure, Shanda underwent the lumbar steroid injection.  (Id.).

---

[13]    "Swelling or morbid enlargement of the lymph nodes."  Stedman's at 25.

[14]    "Enlargement of the thyroid gland."  Id. at 1834.

On May 11, 2011, Dr. Schnell conducted a recheck of Shanda's lumbar spine. (Tr. 245).  Dr. Schnell noted that the recent lumbar steroid injection had helped with Shanda's symptoms.  (Id.).  During a physical examination, Shanda exhibited excellent flexibility of the lumbar spine, but she had difficulty walking on her toes and heels.  (Id.). Shanda also showed discomfort in her left hip and both knees.  (Id.).  Dr. Schnell diagnosed Shanda with degenerative lumbar disk disease.  (Id.).

Shanda returned to Dr. Schnell on June 8, 2011.  (Tr. 244).  Shanda reported using an exercise ball and working out at the gym three days per week.  (Id.).  Dr. Schnell noted that Shanda was able to walk without a limp and showed excellent flexibility in the lumbar spine.  (Id.).  Shanda also had full painless range of motion in the hips.  (Id.).

On July 6, 2011, Shanda saw Dr. Viren "to talk about the process of applying for disability."  (Tr. 229).  Shanda told Dr. Viren that she had chronic pain issues including herniated disk disease, left hip pain and arthritis, left ankle pain and arthritis, and bilateral knee pain.  (Id.).  Shanda stated that she felt unable to perform work as a group home aide or computer-aided drafter because of her pain.  (Id.). Shanda reported having a difficult time getting up, moving around, lifting, or walking.  (Id.).  She also stated that she could not sit for any period of time because of pain and had to get up and move around at least every 15 minutes.  (Id.).  Dr. Viren assessed Shanda with "[m]ultiple chronic pain issues including low back lumbar disk disease as well as arthritis of the hip and knees."  (Id.).  Dr. Viren opined that applying for disability was appropriate because Shanda was "disabled by her pain as noted above."  (Id.).

On July 13, 2011, Dr. Schnell conducted a recheck of Shanda's back.  (Tr. 243, 401).  Shanda indicated that she had quit working and was seeking disability benefits.  (Id.).  During examination, Shanda demonstrated "well-preserved range of her hips, although the left hip does elicit discomfort with internal rotation in a flexed position."  (Id.).  Dr. Schnell advised Shanda to continue with her weight loss regime.  (Id.).

On August 16, 2011, Shanda received a lumbar steroid injection from Dr. Heyer.  (Tr. 468).  Dr. Heyer noted that Shanda exhibited markedly limited range of motion and bilateral weakness.  (Id.).  Dr. Heyer observed that Shanda was using a cane to walk.  (Id.).

Shanda was given another lumbar epidural steroid injection on March 30, 2012.  (Tr. 469).  Dr. Heyer indicated that Shanda "gets great relief from her injections."  (Id.).  Dr. Heyer examined Shanda and found slightly limited range of motion and improved weakness bilaterally.  (Id.).  Dr. Heyer also noted that Shanda had lost nearly 40 pounds and was no longer using a cane to walk.  (Id.).

On April 20, 2012, Shanda presented to Dr. Viren with stiffness and pain across her lower back, as well as discomfort in her right knee and pain in her neck.  (Tr. 422).  Shanda told Dr. Viren that her dog had knocked her over, causing her to fall on her left buttock.  (Id.).  Shanda reported feeling slightly nauseated but had no loss of memory or consciousness and no visual changes.  (Id.).  Dr. Viren noted that Shanda moved stiffly and had diminished range of motion in the neck.  (Id.).  Dr. Viren opined that Shanda had suffered a contusion injury to her left buttock and a "whiplash type injury" to her neck and lower back.  (Id.).  Dr. Viren recommended physical therapy.  (Id.).

On April 20, 2012, following her examination by Dr. Viren, Shanda underwent an initial physical therapy evaluation for her neck, back and shoulder pain.  (Tr. 410).  Klessig noted that Shanda appeared to have a strain from a fall and would benefit from further physical therapy sessions.  (Id.).

On July 2, 2012, Shanda returned to Dr. Viren and reported that her neck was feeling better.  (Tr. 424).  However, Shanda continued to have low back pain and pain radiating up and down her left leg.  (Id.).  Shanda noted that the pain was worse with activity.  (Id.).  Dr. Viren prescribed pain medication and referred Shanda back to Dr. Heyer.  (Id.).

On July 16, 2012, Shanda saw Dr. Heyer for another lumbar steroid injection.  (Tr. 418).  Upon examination, Shanda exhibited limited range of motion, particularly with her left leg.  (Id.).  Dr. Heyer also noticed that Shanda was not using a cane to walk.  (Id.).

On August 15, 2012, Shanda was discharged from physical therapy after 22 sessions.  (Tr. 417).  Klessig reported that Shanda was feeling much better and could manage on her own with an independent home exercise program.  (Id.).  Klessig also noted that all of Shanda's physical therapy goals had been met.  (Id.).

Shanda received another lumbar steroid injection from Dr. Heyer on August 17, 2012.  (Tr. 419).  Shanda demonstrated limited range of motion, especially in the left leg, with some weakness.  (Id.).  Dr. Heyer observed that Shanda was no longer using a cane to walk.  (Id.).

### 4.  Dr. Wallerstein

On January 31, 2013, Shanda visited Dr. Viren to review her application for Social Security disability benefits.  (Tr. 476).  Dr. Viren indicated that she needed assistance in making a disability determination, and she referred Shanda to physical medicine and rehabilitation.  (Id.).

On February 15, 2013, on referral by Dr. Viren for a disability evaluation, Shanda was examined by Dr. Wallerstein.  (Tr. 478-82).

Shanda told Dr. Wallerstein that in April, 2003, she had been laid off from her job as a computer-aided drafter and was not called back to work.  (Tr. 478).  Shanda described working from home on her own computer and taking courses to increase her skills.  (Id.).  Shanda reported falling and injuring her left shoulder in September, 2010, which prevented her from using the computer.[15]  (Id.).  She also reported working in a group home from 2005 until 2011.  (Id.).  Shanda explained that she left this job because of a fall in September, 2010, and because of her back and knee pain and poor balance.  (Id.).  Shanda expressed her desire to return to computer-aided drafting.  (Id.).

Shanda stated that she had poor tolerance for sitting, and she needed to get up and move around for 5 to 10 minutes every half hour.  (Id.).  She indicated that her shoulder felt "pretty good" most of the time, except with repetitive work or overhead reaching.  (Id.).  Shanda described tingling in her hands most mornings upon waking.  (Id.).  Her subjective pain diagram indicated problems with the left anterior shoulder, right anterior hip and group, right knee, and right foot and ankle.  (Id.).  Shanda also noted pain in the posterior cervicothoracic junction, lower thoracic spine, low-back

---

[15]    The Court was unable to find any reference in the medical records to an injury to Shanda's left shoulder in September, 2010, or at any other time.

region, right and left knees, right toes, and left leg and foot. (Id.). In addition, Shanda reported a constant dull ache in the lumbar area, which tended to increase at the end of the day and after prolonged sitting. (Tr. 478-79). This pain improved with stretching, ice, and ibuprofen. (Tr. 479). Shanda reported receiving epidural corticosteroid injections, which helped ease her pain. (Id.).

Shanda indicated that she suffered from heel spurs, tinnitus, headaches, depression, and emotional problems. (Id.). She also had a history of morbid obesity, but she had lost 65 pounds since 2006, and 52 pounds since December, 2011. (Id.). Shanda stated that she had difficulty with concentration because of pain, particularly when she needed to move around. (Id.). She noted that her pain affected her emotions and caused her to feel "frustrated and weepy" and unable to engage in social functions. (Id.). Shanda reported difficulty using stairs, carrying objects, doing repetitive activities. (Id.). She noted that her symptoms caused her to awaken frequently during the night. (Id.).

On examination, Dr. Wallerstein indicated that Shanda demonstrated limited cervical range of motion, limited cervical bending, and mildly limited cervical rotation. (Tr. 480). Dr. Wallerstein also found minimally limited flexion and mild to moderately limited abduction in both shoulders. (Id.). Shanda exhibited mildly limited lumbar extension and a positive Ober's test,[16] "indicating mild limitation in segmental

---

[16]     Ober's Test is used to assess tightness of the iliotibial band. Razib Khaund, M.D. and Sharon H. Flynn, M.D., Iliotibial Band Syndrome: A Common Source of Knee Pain, American Academy of Family Physicians (April 15, 2005), http://www.aafp.org/afp/2005/0415/p1545.html. The iliotibial band is a tendon that runs along the outside of the leg and connects from the top of the pelvic bone to just below the knee.   U.S. National Library of Medicine, Iliotibial band syndrome – aftercare,

mobility . . . ." (Id.). Shanda also showed mild balance instability when changing directions while toe walking, smooth gait, negative straight leg raise, and intact vibratory sensation bilaterally. (Id.). In her upper extremities, Shanda demonstrated a positive Phalen test[17] at the index and long fingers bilaterally, a positive reverse Phalen test at the long, ring, and little fingers bilaterally, and a positive Hoffmann's test[18] at the left thumb. (Id.).

Dr. Wallerstein diagnosed Shanda with clinical depression, obesity, somatoform disorder,[19] bilateral carpal tunnel syndrome, cervical myelopathy, and deconditioning. (Tr. 481). Dr. Wallerstein advised Shanda to wear wrist splints at night and recommended "very gradual" physical therapy and continued weight loss. (Id.). Dr. Wallerstein also recommended medical treatment for depression. (Id.).

With respect to retained functioning, Dr. Wallerstein opined:

> Ms. Shanda currently appears capable of working 4-6 hours per day with 2-3 minute breaks every half hour to

---

MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/patientinstructions/000683.htm (last updated May 15, 2013).

[17] Phalen's maneuver is used to detect carpal tunnel syndrome. "Phalen's Maneuver," Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health (7th ed. 2003), retrieved April 2, 2015 from http://medical-dictionary.thefreedictionary.com/Phalen%27s+maneuver.

[18] The Hoffman-Tinel sign, also known as Tinel's sign, is elicited in cases of suspected carpal tunnel syndrome by tapping the wrist over the median nerve. Jason M. Sansone et al., Jules Tinel (1879–1952) and Paul Hoffmann (1884–1962), 4 Clinical Med. & Res. 85, 85-89 (Mar. 2006).

[19] Somatoform disorder, also known as somatic symptom disorder, "is a long-term (chronic) condition in which a person has physical symptoms that involve more than one part of the body, but no physical cause can be found. The pain and other symptoms people with this disorder feel are real, and are not created or faked on purpose." U.S. National Library of Medicine, Somatic symptom disorder, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000955.htm (last updated Sept. 2, 2014).

stretch/move about.  She can stand 2 hours of the work day and sit the other time.  Would recommend maximum of 1 hour constant standing at a time (but could be less) with at least one half hour of sitting activities in between.  She could climb stairs of 1-2 flights up to 2 times per shift, no working on irregular or slippery surfaces.  Ms. Shanda is capable of lifting up to 20 pounds on an occasional basis, 10 pounds on a frequent basis and 5 pounds on a continuous basis (up to chest height).  She can lift up to 3 pounds overhead briefly but cannot be expected to perform frequent, repetitive or prolonged reaching away from her body or overhead.

(Id.).

Shanda returned to Dr. Wallerstein on March 25, 2013.  (Tr. 499-501).  Shanda reported straining her right wrist while reaching from her bed to the bed stand.  (Tr. 499).  Shanda also indicated that she "tries to keep active on some days" and walks her dog most days.  (Id.).  Dr. Wallerstein examined Shanda's right wrist and found tenderness in the distal volar aspect.  (Id.).  However, palpation and mobilization exercises failed to reproduce any discomfort, other than stiffness.  (Id.).  Dr. Wallerstein advised Shanda to work on improving strength in her left quadriceps and to continue weight loss.  (Id.).

On April 15, 2013, Shanda told Dr. Wallerstein that she had tried shoveling snow a few weeks prior and did not have any significant problems.  (Tr. 496).  Dr. Wallerstein found tenderness along the medial and lateral joint line, but no unusual laxity medially or laterally.  (Tr. 497).  Dr. Wallerstein ordered a nerve conduction study of Shanda's hands and recommended that Shanda continue weight loss and strengthening exercises.  (Tr. 498).

On April 23, 2013, Shanda underwent an electromyographic and nerve conduction study by Dr. Wallerstein.  (Tr. 492-95).  Dr. Wallerstein noted that Shanda appeared brighter and more energetic than in previous visits.  (Tr. 492).  Upon physical

examination, Shanda exhibited a positive Tinel sign bilaterally, as well as a positive Phalen's test bilaterally.  (Id.).  Motor conduction was normal.  (Id.).  Dr. Wallerstein diagnosed Shanda with early to mild bilateral carpal tunnel syndrome.  (Tr. 493).

On May 7, 2013, Dr. Wallerstein observed that Shanda looked "better-brighter. More spontaneous, and more spontaneous smiles.  Response that she 'doesn't feel like leading myself slight into those dark spots.'"  (Tr. 487).  Shanda noted an increased tolerance to standing and no knee pain after walking short distances.  (Id.).  Shanda also reported not having to wear a knee brace as long she takes shorter steps.  (Id.). However, continued shoulder pain interfered with Shanda's ability to sleep.  (Id.).  Dr. Wallerstein suggested corticosteroid injections in the upper thoracic area, but Shanda declined the procedure at that time.  (Tr. 489).

On June 18, 2013, Shanda complained of tenderness over her posterior left thigh after attempting to stop a wheelbarrow from tipping over.  (Tr. 484).  Shanda admitted that she had not been doing her exercises.  (Id.).  She also reported joining a women's group, which, in Shanda's words, "reflect[ed] her personal growth and insight into caring for herself and looking after her own needs."  (Id.).  Dr. Wallerstein advised Shanda to ease back into her stretching exercises.  (Tr. 486).

### 5.    Obesity

From December 15, 2011 to January 15, 2013, Shanda underwent bariatric treatment with Dr. James Q. Donovan.  (Tr. 430-66, 470, 473-75).  Dr. Donovan set Shanda's target weight at 200 pounds.  (Tr. 432).  Over the course of treatment, Shanda lost 48 pounds through diet, exercise, journaling of food intake, and appetite

suppressants.  (Tr. 434, 437, 440, 443, 446, 449, 452, 455, 458, 461, 464, 470, 473).

Shanda's last recorded weight, on January 15, 2013, was 217 pounds.  (Tr. 473).

### 6.    Depression

On April 19, 2011, Shanda visited Dr. Viren for a complete physical.  (Tr. 226-28).  Shanda indicated "a lot of personal and family stress," and Dr. Viren noted that Shanda was experiencing "a lot of stress with some anxiety and depression."  (Tr. 227).  Dr. Viren also noted that Shanda was "somewhat down" but in no obvious distress.  (Id.).  Dr. Viren recommended no follow-up treatment with respect to Shanda's anxiety and depression.

On September 24, 2012, Shanda saw Dr. Viren to discuss her situation at home.  (Tr. 427).  Shanda reported feeling "quite depressed" and "trapped in her relationship."  (Id.).  Shanda described her husband as verbally abusive and controlling, but also "a good man."  (Id.).  Shanda also indicated that her husband had been physically abusive with both Shanda and her children, but this had not occurred for many years.  (Id.).  Shanda told Dr. Viren that she had considered leaving her husband but noted that she was financially dependent on him.  (Id.).  Dr. Viren observed that Shanda was "tearful and in some obvious emotional distress."  (Id.).  Dr. Viren diagnosed Shanda with an emotional stress reaction and recommended that Shanda receive counseling.  (Id.).  Dr. Viren did not believe Shanda needed antidepressants at that time.  (Id.).

On January 17, 2013, Shanda's therapist Fromberg wrote the following letter:

> I have been seeing Ms. Shanda since October 2012 on a weekly basis.  Ms. Shanda presents with severe depression including a markedly diminished interest in activities and fatigue.  Ms. Shanda has been exposed to numerous traumatic events throughout her life where she experienced an actual threat.  Ms. Shanda experiences intense

> psychological distress at exposure to internal and external cues that resemble aspects of the traumatic events.  Ms. Shanda avoids conversations associated with the trauma, is unable to recall important aspects of the trauma, and experiences feelings of detachment from others.  Ms. Shanda experiences irritability and hypervigilance.  This disturbance causes significant distress in important areas of Ms. Shanda's life.  There has been minimal improvement in Ms. Shanda's symptoms although she continues to work on strategies to manage these symptoms of Depression and Posttraumatic Stress Disorder (PTSD).  Ms. Shanda is a pleasant person who presents no risk to others. I would describe her as flexible, persistent and possessing above average intelligence.  Due to the long term nature of her symptoms, I believe that Ms. Shanda will continue to be at risk for experiencing symptoms and would not be able to sustain any type of competitive employment.

(Id.).

On January 31, 2013, Shanda returned to Dr. Viren to discuss her application for Social Security benefits.  (Tr. 476).  During the appointment, Dr. Viren performed a depression screening.  (Id.).  Shanda was asked whether she had been bothered by little interest or pleasure in doing things in the past two weeks, and she responded no. (Id.).  Shanda also denied feeling down, depressed, or hopeless.  (Id.).

### C.   State Agency Reviewing Physicians and Psychologists and Consultative Reports

On August 30, 2011, State Agency consultant Dr. Trevor Anderson completed a physical RFC assessment of Shanda, upon review of medical records received from the Lake View Clinic, the Orthopaedic Association of Duluth, the Lakewalk Surgery Center,[20] as well as the activities of daily living described by Shanda.  (Tr. 375-85).  Dr. Anderson found that Shanda was unlimited in her ability to push or pull, could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk (with normal breaks)

---

[20]   These records included treatment notes from Dr. Viren and Dr. Schnell.

for at least 2 hours in an 8-hour workday, and sit (with normal breaks) for about 6 hours in an 8-hour workday. (Tr. 379). Dr. Anderson also determined that Shanda could occasionally climb ramps or stairs, and could occasionally balance, stoop, kneel, crouch, and crawl; however, Shanda's obesity and degenerative joint disease in her knees would prevent her from using ladders, ropes, or scaffolds. (Tr. 380).

As to manipulative limitations, Dr. Anderson checked a box indicating that Shanda was limited in "[r]eaching all directions (including overhead)." (Tr. 381). In response to the question "[d]escribe how the activities checked 'limited' are impaired," Dr. Anderson explained that Shanda should "[l]imit R arm overhead lifting and repetitive reaching to occasional." (Id.). Dr. Anderson also opined that Shanda was not limited in handling (gross manipulation), fingering (fine manipulation), or feeling (skin receptors). (Id.). According to Dr. Anderson, Shanda had no visual or communicative limitations. (Tr. 381-82). With respect to environmental limitations, Dr. Anderson determined that Shanda was unlimited in all areas, except that Shanda should avoid concentrated exposure to hazards such as machinery or heights. (Tr. 382).

Dr. Anderson stated that Shanda's impairments could reasonably be expected to produce the alleged symptoms and that those symptoms were not inconsistent with the objective evidence of record. (Tr. 383). Dr. Anderson further indicated that Shanda's statements about her symptoms and their limiting effects were reasonably credible. (Id.).

Dr. Anderson noted that Shanda's file contained no medical source statement regarding her physical capacities. (Tr. 384).

On August 31, 2011, Mary Sullivan, Ph.D. completed a psychological evaluation of Shanda based on her review of medical records received from the Lake View Clinic, Orthopaedic Association of Duluth, and Lakewalk Surgery Center, as well as a conversation with Shanda. (Tr. 386-398). Dr. Sullivan noted that a report from April, 2011, indicated that Shanda "has a lot of personal and family stress at this time," and the examination indicated under "Review of Systems" stated that she was in "obvious distress with some anxiety and depression." (Tr. 398). Dr. Sullivan indicated that the diagnosis set out in this report was for physical, and that this was the only time these symptoms were mentioned. (Id.)

On August 11, 2011, Dr. Sullivan spoke to Shanda who told Dr. Sullivan that she had "some situational stressors with some deaths," but noted that she was not taking psychotropic meds and was not seeing any mental health professional. (Id.). Dr. Sullivan noted that Shanda had not been hospitalized for any mental or psychological issues. (Id.). Shanda stated that she did not believe she had any psychological symptoms which impacted her ability to work. (Id.).

Dr. Sullivan considered Shanda's activities of daily living. Dr. Sullivan indicated that Shanda cared for pets, did not need reminders for grooming or taking medications, and could cook, perform light housekeeping and gardening, do laundry, go outside daily, walk, drive a car, go out alone, shop for groceries twice a week, pay bills, count change, and handle money. (Id.). In addition, Dr. Sullivan noted Shanda's hobbies such as reading, gardening, crafting, sewing, watching TV, playing games, and socializing with others. (Id.). Dr. Sullivan opined that Shanda's limitations in daily living were physical. (Id.). Dr. Sullivan noted that Shanda had no problems getting along with

others, and no problems paying attention as long as pain was in control. (Id.). In addition, Shanda could follow written and spoken instructions, had no problems getting along with authority figures, could handle stress in moderation, and could adjust to changes in routine. (Id.).

Based upon this evidence, Dr. Sullivan concluded that Shanda had no medically determinable mental impairment. (Tr. 386, 398).

On September 11, 2011, the SSA communicated to Shanda its decision of no disability. (Tr. 58-59). Based on the records received from the Lake View Clinic, Orthopaedic Association of Duluth, and Lakewalk Surgery Center, as well as the evaluations by Drs. Anderson and Sullivan, the SSA concluded that her impairments in combination were not sufficiently severe to be disabling and that she could perform her former position as a computer-aided drafter.[21] (Tr. 59). In reaching this determination, the SSA stated that Shanda had the ability to stand and walk without assistance; she had the ability to use her hands and arms to perform tasks; the pain caused by her condition was not severe enough to keep her from doing basic daily activities; her weight did not keep her from doing normal activities; records indicated a one-time appointment where she had some situational stressors with some anxiety and depression noted (but no diagnosis noted); the totality of the evidence supported no on-going mental health symptoms; and she had the ability to understand, remember and carry out daily activities. (Id.).

---

[21]   In its Explanation of Determination, the SSA stated that Shanda had alleged she was disabled based on knee, neck and shoulder problems, bilateral knee degenerative joint disease, right shoulder rotator cuff tear and repair and impingement, and chronic low back degenerative joint disease. (Tr. 59). The SSA also noted that the medical records showed that she had "obesity, question of depression and anxiety." (Id.).

Shanda applied for reconsideration, alleging bilateral knee degenerative joint disease, right shoulder impingement, right shoulder rotator cuff issues, chronic low back degenerative joint disease and neck pain.  (Tr. 405).  On November 29, 2011, Dr. Cliff Phibbs reviewed the record, noting no changes in activities of daily living and no new illnesses.  (Id.).  Dr. Phibbs indicated that he had reviewed all of the evidence in the file and affirmed Dr. Anderson's assessment.  (Tr. 403-05).

On December 2, 2011, Dr. James Alsdurf affirmed the determination by Dr. Sullivan.  (Tr. 407-09).

On December 5, 2011, the SSA notified Shanda of its decision on her application for reconsideration.  (Tr. 60-61).  The SSA informed Shanda that her impairments were not sufficiently severe to be disabling and that she could perform her former position as a computer-aided drafter, using the same reasons for its decision as in the initial application.  (Tr. 61).

## VI.   ADULT FUNCTION REPORT AND HEARING TESTIMONY

### A.   Shanda's Adult Function Report

On July 21, 2011, Shanda submitted an Adult Function Report.  (Tr. 166-73). Shanda stated that, because of her injuries, she was no longer able to walk any distance, remain standing for long, kneel down, or maintain her balance.  (Tr. 166).  She also noted that her pain increased throughout the day.  (Id.).

Shanda described a typical day as follows:  "I use a cane for a time in the morning – get up – bathroom – have tea – breakfast, walk dog (try 6 blocks), shower – errands – work out – lunch – hobbies or time w/friends – make dinner – TV – games." (Tr. 167).  Shanda indicated that she did not provide care for any children, friends, or

family members, but she did have a dog that she feeds, walks, brushes, and cleans up after.  (<u>Id.</u>).  She noted that her husband helped walk, feed, and brush the dog.  (<u>Id.</u>).  Before her injuries, Shanda would go hiking, walk long distances, use the stairs without a cane, do heavy gardening, and balance on her heels.  (<u>Id.</u>).  Shanda noted that her knee pain kept her awake at night.  (<u>Id.</u>).

With respect to personal care, Shanda explained that she took showers because she was not able to climb out of the tub easily.  (<u>Id.</u>).  When using the toilet, Shanda indicated that she used a "reacher tool" to avoid twisting her back.  (<u>Id.</u>).  Shanda noted that she did not need to be reminded to take care of grooming, personal needs, or taking medications.  (Tr. 168).

Shanda indicated that she prepared her own meals daily and is "able to cook for the most part, [but] can't remain standing," and that her husband helped with lifting heavy pots.  (<u>Id.</u>).  With respect to house and yard work, Shanda reported performing light housekeeping 1/2 hour a day, light gardening 1/2 hour a day, and laundry for 4 hours once a week.  (<u>Id.</u>).  Shanda noted that her husband helped with vacuuming, mowing, and other heavy chores because of her pain.  (Tr. 168-69).

Shanda stated that she went outside every day and that she was able to go out alone.  (Tr. 169).  When going out, Shanda indicated that she walked, drove a car, or rode in a car.  (<u>Id.</u>).  Shanda reported shopping for groceries for half an hour twice a week, and shopping for clothes, gifts, and pet products in stores or by computer.  (<u>Id.</u>).  She noted that she limited her shopping to two hours or less, with breaks.  (<u>Id.</u>).  Shanda checked boxes indicating that she could pay bills, count change, handle a savings account, and use a checkbook or money orders.  (<u>Id.</u>).

As to hobbies and interests, Shanda reported reading, gardening, crafting, sewing, watching TV, and playing games. (Tr. 170). Because of her injuries, however, Shanda stated that she could no longer able to do heavy gardening and could not spend much time at the computer without problems. (Id.).

With regard to social activities, Shanda reported visiting people at home, going to movies and lunches, making phone calls, going to picnics, and doing "family stuff." (Id.). Shanda noted that she tried to plan a social activity every week. (Id.). She also stated that she went to the library, her parents' nursing home, fitness center, neighborhood park, and grocery store. (Id.).

Shanda checked boxes indicating that her injuries affected her ability to lift, squat, stand, walk, sit, kneel, and climb stairs. (Tr. 171). Shanda did not check the box indicating problems with reaching. Shanda alleged that she could not squat or kneel, she could walk only about 4 to 6 blocks at a time, standing hurt after 15 minutes, and her back hurt if she sat more than half an hour. (Id.). Shanda noted that she had intense pain in the right knee if she walked too far, and she had to rest 10 minutes or more before walking further. (Id.).

Shanda indicated that she had no problem paying attention if her pain was in control and that she could follow written and spoken instructions. (Id.). Shanda further stated that she had no problem with authority figures and that she could handle moderate stress and changes in routine. (Tr. 172).

Shanda stated that she used a cane when going outdoors, walking on stairs, and getting in and out of chairs. (Id.). She also noted that her physical therapist suggested using a brace. (Id.). Shanda stated that she took medications for her impairments. (Tr.

173).  However, because she had allergies to many pain meds, Shanda indicated that she tried to control her pain with ibuprofen, stretching, and exercise, as well as spinal cortisone injections.  (Id.).

With respect to work history, Shanda reported working as a computer-aided drafter from August of 1996 until April, 2003.  (Tr. 174).  In this position, Shanda developed shop drawings for a steel fabricator.  (Tr. 177).  Shanda indicated that each day she walked for 1 hour, stood for 1/2 hour, sat for 7 hours, climbed stairs 2 or 3 times a day, wrote or typed for 7 hours, and handled large objects occasionally.  (Id.).  Shanda noted that she frequently carried rolls of drawings weighing less than 10 pounds.  (Id.).

From June, 2003 to June, 2010, Shanda reported being self-employed as a computer-aided drafting contractor.  (Tr. 174).  Shanda stated that she "tried to do contracting out of home office but ha[d] been unable to get steady work." (Tr. 176).  In this position, Shanda noted that each day she walked for 1 hour, stood for 1 hour, sat for 4 hours, and handled large objects "often."  (Id.).  Shanda explained that "this job was mainly office work, but occasional field-shop stuff required."  (Id.).

Shanda also indicated that she worked as a program assistant for an Adult Disabled Assisted Living Home from August 10, 2005 to June 29, 2011.  (Tr. 174).  As a program assistant, Shanda stated that she "help[ed] clients with daily home life.  Home chores – meals – outings – shopping – personal care – medication – etc."  (Tr. 175).  Shanda reported that she walked for 1 hour, stood for 2 or more hours, sat for 1 hour, climb stairs 6 to 8 times, stooped for 1/2 hour, crouched for 15 minutes, handled large objects the "whole time maybe," reached occasionally, and wrote, typed or handled

small objects for 1 hour. (Id.). Shanda noted that she lifted clients weighing more than 100 pounds in and out of their wheelchairs two or three times per shift. (Id.).

### B. Hearing Testimony

At the hearing before the ALJ, Shanda testified that she had worked for a long time as a computer-aided drafter. (Tr. 34). In that capacity, Shanda recalled that she would develop blueprints for a steel shop in the engineering department. (Id.). Shanda used a computer to draw the blueprint, which involved sitting in an office chair in front of a desk, with the left hand on the keyboard and the right hand on the mouse. (Tr. 34-35, 36). Shanda indicated that she would have to "go back and forth between [her] materials and" the computer. (Tr. 35). She noted that had the mouse in her hand "pretty much continually," and that she would have to move her arm "[b]ack and forth, up and down, just moving [her] arm around . . . ." (Tr. 35-36). Shanda testified that the job "requires a high degree of concentration," the ability to remember well and read the design drawings, as well as good physics and math skills. (Tr. 36). She stated that making a mistake cost "[b]ig time money" and caused "[b]ig time frowns from big time bosses." (Id.).

When asked whether she could still perform her duties as a computer-aided drafter, Shanda responded: "I do not think I could do those in any, for any kind of length of time like I use to, was able to then, no." (Id.). Shanda explained that she could not sit in a chair long enough to maintain her concentration because of pain in her back, knee, and leg. (Id.). She stated that she "would have to get up and leave, and come back and, you know, regain my concentration every half hour or so." (Tr. 37). Shanda noted that "time is money when you're drafting." (Id.). Shanda further indicated that, if

she used a computer grip too much, she experienced pain in her hands and across her neck and shoulder.  (Id.).  Shanda alleged that repetitive motions caused pain, and that her shoulder condition made it uncomfortable to move her arm around.  (Tr. 38).  In addition, Shanda testified that pushing the buttons on the mouse caused pain.  (Id.).  She described the pain as starting in her neck, and spreading down to her elbow and into the tips of the fingers.  (Id.).  Shanda rated her pain as a 6 or 7 on a 10-point scale, but she noted that it had decreased since she lost weight.  (Tr. 44).  Shanda estimated that she could work for about 30 to 45 minutes before the pain would start, and that the pain would prevent her from concentrating.  (Tr. 39-40).  Out of an 8-hour workday, Shanda believed that she could spend no more than 2 or 3 hours sitting.  (Tr. 42-43).  Further, Shanda indicated that she was allergic to most pain medications, and therefore, she had to manage her pain with ibuprofen.  (Tr. 45).

In addition to her job, Shanda stated that her neck, shoulder, and hand pain affected her ability to perform household chores, particularly those involving repetitive motions.  (Tr. 40-42).  Shanda indicated that her pain also disrupted her sleep and caused her to be fatigued when driving.  (Tr. 48).

Shanda testified that she had some problems with depression, but her symptoms improved after seeing a counselor and purchasing a light box.  (Tr. 45-48).

The ALJ asked Shanda to describe her previous work at the group home. (Tr. 50).  Shanda responded that she was a program assistant at a small group home for adults.  (Id.).  Shanda's duties involved lifting a client in and out of a wheelchair and assisting the client with dressing, cooking, cleaning, and laundry.  (Id.).  Shanda testified that she had quit her job at the group home in 2011 because she was concerned that

her physical condition would prevent her from rendering emergency physical assistance

to the clients.  (Id.).  Shanda also stated that she took computer-aided drafting courses

in 2010, but she could not continue because of a shoulder injury.  (Tr. 50-51).

The ALJ then asked the VE to assume the following hypothetical:

> It involves a middle-aged lady who has this work history and a high school plus education, who is currently 55, and who would have been about 52 at the beginning of the relevant period, 2009.  And she will present with pervasive work activities with capacity for some light work, but not the full range of same.  The specifics are that she could do some light work with the limitation that in a regular eight hour day she'd be on the feet standing and walking for no more than two of same.  And it requires most of that to be done at one time.  And with regard to her capacity for sitting it would be for at least six hours of an eight-hour day.  Assume that if she had benefit of (INAUDIBLE) and shift, at least a mini break after every second hour, that sitting would essentially be not restricted.  And, also, if the worker spent two hours on the feet standing or walking, the balance of a workday could be done in a seated position if needed.  She a right-handed individual and you should know that the postural adjustments of bending, kneeling, stooping, and vigorously twisting the body from, from side to side, such movement could be done less than occasionally, perhaps no more than about 10 percent.  She can occasionally lift or carry about 20 pounds, frequently do the same with up to 10, and per report, continuously handle up to five pounds, lifting things only up to chest height.  She has impairment to the dominant right upper extremity per, per extension away from the body, like overhead lifting with the right upper extremity to a high shelf no more than about three pounds, and such activity could be done briefly, probably less than a third of the time.  But the nondominant hand and arm are not impaired.  Gripping and fingering are, are bilaterally are not impaired.  And lifting dominant right upper extremity, movement in all directions close in to the body is not impeded.  Extension of the right upper extremity straight out from the body would not be impeded, reduce on a frequent basis in the course of an eight hour day.

(Tr. 52-53).   The VE testified that, within the ALJ's hypothetical, the home attendant position could not be performed, but the computer-aided drafting position could be performed.  (Tr. 53).  Specifically, the VE stated:

> Your Honor, within that hypothetical, certainly the past work as the home attendant could not be performed.  But the, within the way that hypothetical is constructed, the drafting position could be performed.  The gripping and fingering okay, movement close in is okay, extension away from the body is okay, and, and, and the weight restriction would be within what we'd normally expect of a computerated [sic] drafting position.  And most of the work is done these days seated at a computer.  So within the hypothetical, I believe the past work could be performed.

(Id.).

The ALJ then asked the VE to add the following limitations to the previous hypothetical:

> With, with the nondominant limb, the left upper extremity, the left upper extremity, on standard measure, there's, there's at least slightly diminished gripping capacity with the left hand by standard measure.  However, for, for grasping, handling, and fingering items that are up to 20 pounds heavy, at least occasionally, handling pens and pencils there's no impediment.  It's slightly weaker in terms of grasping and grip strength and also, with the dominant right upper extremity would have been covered.  With regard to her mental health, please assume that the worker would have difficulty doing significant collaboration at a high level with new and unfamiliar persons in retail and other settings.  There's essentially no limitation or an insignificant one, if she's working with persons who are familiar to her.  And because she has knee impairments, during those periods on the feet while she can walk, she could rarely be walking on uneven ground, like a construction site, due to prior knee impairment.

(Tr. 53-54).  The VE testified that the additional limitations would not change his answer to the previous fact pattern and that the past work as a computer-aided drafter could be performed.  (Tr. 54).

Shanda's attorney asked the VE to "add to the Judge's hypothetical limitation given by the State Agency that use of the right arm, the dominant right arm for repetitive reaching would be limited to occasional." (Id. citing Tr. 381). The VE responded:

> That would, in my opinion, that would, excuse me, would disable an individual from performing sedentary work because it's the dominant arm and it's limiting to occasional and all sedentary work basically requires ability to frequent [sic] reach, handle, and finger, and especially on some of the dominant right. So based on that, there would be the inability to perform sedentary work.

(Tr. 54-55). The VE added that the individual would not be able to perform computer-aided drafting work. (Tr. 55).

Next, Shanda's counsel referred the VE to Dr. Wallerstein's opinion that Shanda could not be "expected to perform frequent repetitive or prolonged reaching away from her body or overhead" with the dominant hand, and asked what would be the effect of that restriction. (Id., citing Tr. 481). The VE testified that this would also preclude the ability to perform sedentary work because it requires frequent reaching. (Id.).

Shanda's counsel then asked the VE to "assume that because of pain, or depression, or fatigue, or the combined effects of all of those, she should not do jobs that require sustained intense concentration and attention, so that she'd be limited, say, to, three or four step tasks on a, on a consistent basis. She would have difficulty on a full-time basis doing more than that." (Id.). The VE opined that past work as a computer-aided drafter could not be performed because such work was skilled, and limiting the individual to three to four steps with limited concentration would preclude her from doing that type of work. (Id.). The VE also testified that the job of a computer-

aided drafter had a reasoning level five, math level five, and language level four.[22]  (Tr.

55-56).  The VE added: "So that would be performing complex tasks, complex, certainly

multi, many tasks."  (Tr. 56).

At the conclusion of the testimony, Shanda's attorney summarized her case:

> It seems to me that we have a lady that's basically limited to sedentary work.  Her past work was, was very complex and required her to use her, her dominant right arm pretty much continuously.  And she can no longer do either one of those things.  She, and plus she has difficulty sitting for prolonged periods of time which in, in some tasks might be less of a problem, but in, and, and, and as she described it, it interferes with the concentration.  She, she's, she's paid to, to produce a complex piece of work and getting up and breaking her focus, it's going to interfere with it.  So for all those reasons, I, I think what you ought to do is find her disabled under the medical vocational guidelines because she can't do her past work, and she's limited to sedentary.

(Tr. 56).

## VII.   DISCUSSION

### A.   <u>Shanda's Ability to Reach with Her Right Arm</u>

The ALJ had determined that Shanda could lift overhead with her dominant right

arm[23] no more than 3 pounds briefly for less than 1/3 of the workday, but she was not

impaired in the bilateral upper extremities in gripping, fingering, moving in all directions,

or frequently extending in front of the body. (Tr. 18).  Shanda contended that the ALJ

---

[22]   Reasoning level five requires the individual to "[a]pply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions.   Interpret an extensive variety of technical instructions in mathematical or diagrammatic form.   Deal with several abstract and concrete variables."  <u>Dictionary of Occupational Titles</u> app. C (4th ed. 1991), <u>available at</u> http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM. Math level five may involve the application of advanced algebra, calculus, and statistics.  <u>See</u> <u>id.</u>

[23]   At the administrative hearing, Shanda testified that she is right-handed.  (Tr. 35).

erred by failing to mention or address Dr. Wallerstein's opinion that she could not perform frequent, repetitive or prolonged reaching away from her body. Pl.'s Mem., pp. 19-20; Pl.'s Reply, p. 5. According to Shanda, the ALJ was required to give good reasons for discounting this portion of Dr. Wallerstein's opinion because Dr. Wallerstein is a physical medicine specialist, and Dr. Viren, the primary care provider, had referred Shanda to him for his expertise in assessing physical restrictions. Pl.'s Mem., p. 20; Pl.'s Reply, pp. 11-12. Shanda asserted that the ALJ "has to deal with this opinion by Dr. Wallerstein, because the Vocational Expert testified that it precludes [Shanda's] past work" as a computer-aided drafter.[24] Pl.'s Reply, p. 5.

Likewise, Shanda argued that the ALJ ignored the opinions of the State Agency consultants, Dr. Anderson and Dr. Phibbs, that Shanda's repetitive reaching with the right arm should be limited to occasional. Pl.'s Mem., p. 21 (citing Tr. 381). The ALJ had stated that he gave persuasive weight to their opinions that Shanda was "capable of a range of light work with the ability to stand and walk at least two hours and occasionally lift overhead with the right arm." (Tr. 21). Shanda contended, however, that the ALJ did not address, much less give any reason for, his refusal to include the additional restriction that her ability to reach should be limited to occasional. On this basis, Shanda submitted that the ALJ's decision could not be sustained. Pl.'s Mem., p. 20.

---

[24]     A person of advanced age (55 or over) who is limited to sedentary work is disabled if the person can no longer perform vocationally relevant past work and has no transferable skills. 20 C.F.R. § Pt. 404, Subpt. P, App. 2, § 201.00(d). Shanda was born April 4, 1957. (Tr. 156). Thus, she was over 55 years of age at the time of the administrative hearing in February, 2013. Accordingly, Shanda must be found disabled if she cannot perform her past work as a computer-aided drafter.

Before addressing Shanda's arguments, the Court sets forth the principles that guide its decision.

First, as a general rule, "'[a] treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (alteration in original) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)). "However, '[a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole.'" Id. at 1064 (citation omitted). "'An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" Bernard v. Colvin, 774 F.3d 482, 487 (8th Cir. 2014) (quoting Goff, 421 F.3d at 790); Prosch, 201 F.3d at 1013-14 ("It is well established that an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.").

Second, if the ALJ does not grant controlling weight to the treating physician's opinion, the ALJ must determine how much weight to grant a non-controlling medical opinion. 20 C.F.R. §§ 404.1527(c). In doing so, the ALJ should consider the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinions, the consistency of the opinion with the record as a whole, and whether the opinion was from a specialist in his or her area of specialty. 20 C.F.R § 404.1527(c)(1)-(6).

Third, as for the non-examining state agency physicians, SSA regulations dictate that in addition to considering the rules set out in 20 C.F.R § 404.1527(a)-(d), the following rules apply to non-examining sources, including State Agency consultants:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether you are disabled.

20 C.F.R § 404.1527(e)(2)(i).

Fourth, "[w]hether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight." Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008) (citing Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001)); see also 20 C.F.R. § 404.1527(c)(2) ("When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); 20 C.F.R. § 404.1527(e)(2)(ii) ("Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the

administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.")

At the end of the day, it is the "province of the ALJ, not the Court, to weigh and resolve conflicting evidence provided by medical professionals." Lundgren v. Astrue, Civ. No. 09-3395 (RHK/LIB), 2011 WL 882084 at *12 (D. Minn., Feb. 7, 2011), report and recommendation adopted, 2011 WL 883094 at *1 (D. Minn., Mar. 11, 2011) (citing Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995) ("It is the ALJ's function to resolve conflicts among the various treating and examining physicians.")).

Fifth, an ALJ cannot determine that a physical or mental condition is or is not disabling for the purpose of assessing the RFC without a medical opinion to support that opinion. See Lauer v. Apfel, 245 F.3d 700, 703-04 (8th Cir. 2001).

> Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000), we have also stated that a "claimant's residual functional capacity is a medical question," Singh, 222 F.3d at 451. "[S]ome medical evidence," Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace," Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Id. Therefore, in determining a claimant's RFC, the ALJ "may not draw upon [her] own inferences from medical reports." Nevland, 204 F.3d at 858 (citation omitted); see also Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, an ALJ is simply not qualified to interpret raw medical data in functional terms . . . .").

Sixth, judicial review of an agency decision is limited to the grounds identified in the agency's decision. See Securities & Exchange Comm'n v. Chenery Corp., 318 U.S.

80, 87 (1943);[25] Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001) ("'A reviewing court may not uphold an agency decision based on reasons not articulated by the agency,' when 'the agency [has] fail[ed] to make a necessary determination of fact or policy' upon which the court's alternative basis is premised.") (alterations in original) (quoting Healtheast Bethesda Lutheran Hosp. and Rehab. Ctr. v. Shalala, 164 F.3d 415, 418 (8th Cir.1998)); see also In Home Health v. Shalala, Civ. No. 94-1408 (RHK/FLN), 1997 WL 269486, at *4-5 (D. Minn. Mar. 5, 1997) ("[T]he court cannot uphold the Secretary's decision based upon reasons she did not articulate in the decision itself.") (citing Mayo v. Schiltgen, 921 F.2d 177, 179 (8th Cir. 1990)).  "In other words, a reviewing court cannot search the record to find other grounds to support the decision. A court must consider the agency's rationale for its decision, and if that rationale is inadequate or improper the court must reverse and remand for the agency to consider whether to pursue a new rationale for its decision or perhaps to change its decision." Mayo, 921 F.2d at 179 (citation and footnote omitted).

Based on the above principles, the Court cannot uphold the ALJ's decision.  The AKJ failed to address, much less weigh, the only medical opinions in the record regarding Shanda's ability (and frequency) to reach and the impact of these limitations on her ability to perform her prior job as a computer-aided drafter.  Drs. Wallerstein, Anderson and Phibbs all opined that Shanda's ability to engage in repetitive reaching was limited.[26]  (Tr. 381, 403-405, 481).  Not only did the ALJ completely fail to account

---

[25]    The Court refers to this as the "Chenery Doctrine."

[26]    The Court rejects the Commissioner's interpretation of Dr. Anderson's notation regarding Shanda's ability to lift and reach that the word "overhead" applied to both lifting and reaching limitations.  In the Commissioner's view, Dr. Anderson was not limiting Shanda's ability to reach out in front of her, but rather was only restricting her

for these opinions in his decision, but there are no medical reports in the record upon which the ALJ could rely to contradict these opinions.  And more critically, this is not a situation where it could be said that the claimant had failed to apprise the ALJ of the issue.  For example, in Shanda's prehearing brief, which was submitted before Dr. Wallerstein's opinion was issued,[27] Shanda informed the ALJ that the State Agency reviewer had limited her to "sedentary exertional level with fairly significant manipulative limits (only occasional right arm overhead lifting and repetitive reaching)," and that she

---

ability to lift and reach overhead.  However, Dr. Anderson's notation must be interpreted in the context of the SSA form he was using.  In this form, he was asked to rate Shanda's manipulative limitations.  (Tr. 381).  Dr. Anderson checked a box indicating that Shanda was limited in "[r]eaching all directions (including overhead)."  (Id.).  In response to the question "[d]escribe how the activities checked 'limited' are impaired," Dr. Anderson explained that Shanda should "[l]imit R arm overhead lifting and repetitive reaching to occasional."  (Id.).  A fair reading of his notation was that he was limiting not only her ability to lift overhead to occasional, but also her ability to engage in repetitive reaching.  In any event, if this notation was unclear or ambiguous, and could fairly be read as suggested either by Shanda or the Commissioner, then the ALJ should have contacted Dr. Anderson to clarify his opinion or ordered an additional consultative examination with respect to Shanda's reaching ability.  See 20 C.F.R. §§ 404.1519p(b) ("If the [consultative examination] report is inadequate or incomplete, we will contact the medical source who performed the consultative examination, give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report."); 416.919a(b) ("We may purchase a consultative examination to try to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision on your claim."); Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004) ("The ALJ is required to recontact medical sources and may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of a disability claim.") (citations omitted); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) (finding that the ALJ should seek additional clarifying statements from a treating physician when a crucial issue is undeveloped); Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992) ("When a claimant's medical records do not supply enough information to make an informed decision, the ALJ may fulfill this duty by ordering a consultative examination. 20 C.F.R. § 416.917. Moreover, '[i]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision.'") (citation omitted).

[27]    Dr. Wallerstein saw Shanda on February 15, 2013, for the disability evaluation, but his report was not generated until February 25, 2013, the day before the hearing. (Tr, 478-482).

could not perform her prior work as a computer-aided drafter.  (Tr. 208).  Similarly, at the hearing, counsel for Shanda expressly questioned the VE regarding the impact of the limitations placed on Shanda's ability to engage in repetitive reaching, and the VE unequivocally testified that those limitations would prevent her from performing sedentary work and, in particular, her prior work as a computer-aided drafter.  (Tr. 54-55).  Counsel also argued to the ALJ at the conclusion of the hearing that Shanda's past work required her to use her dominant right arm "pretty much continuously" and she could no longer do that.  (Tr. 56).  In fact, the ALJ acknowledged that Shanda had testified at the hearing that she could not use the computer more than 30-45 minutes or perform too many repetitive motions.  (Tr. 18).

The ALJ was required to base his determination on medical evidence that Shanda was capable of frequently extending her right arm in front of the body, and this he did not do.  Further, if the ALJ had concluded that Shanda could frequently extend her right arm in front of her body—a determination which was completely at odds with the opinions of Drs. Wallerstein, Anderson and Phibbs—then the ALJ was required to explain the basis of that decision and why he was not giving their opinions any weight.  Again, the ALJ did not do that.  On this basis, reversal of the ALJ's decision is warranted.

As for the Commissioner's contention that this Court should uphold the ALJ's decision either because it was obvious that he was giving no weight to that portion of Dr. Wallerstein's opinion bearing on Shanda's ability to reach with her right arm, or alternatively, substantial evidence supported the ALJ's conclusion that Shanda was limited only in her ability to reach overhead, that contention is rejected.  Pursuant to the

Chenery Doctrine, "a reviewing court cannot search the record to find other grounds to support the decision. A court must consider the agency's rationale for its decision, and if that rationale is inadequate or improper the court must reverse and remand for the agency to consider whether to pursue a new rationale for its decision or perhaps to change its decision." Mayo, 921 F.2d at 179 (citation and footnote omitted). The Commissioner's post hoc rationale cannot save the error committed by the ALJ.

## B. Shanda's Subjective Complaints of Pain and Impact on Her Concentration

Shanda argued that the ALJ failed to properly evaluate her testimony and weigh the evidence in the record that showed that she could not maintain the high level of concentration necessary to work as a computer-aided drafter, including the opinions of Dr. Viren and Dr. Wallerstein. Pl. Reply, pp. 8-12. Additionally, Shanda contended that the ALJ failed to consider how her severe physical impairments to the knees, right shoulder, cervical and lumbar spine, and obesity, in combination with the non-severe mental impairment of depression, affected her ability to maintain the high level of concentration required to work as a computer-aided drafter. Id., pp. 12-14. The Court disagrees and concludes that substantial evidence in the record supports the ALJ's determination regarding Shanda's concentration.

First, when determining that Shanda's depression was non-severe, the ALJ analyzed the functional area of "concentration, persistence and pace" under the B criteria for mental disorders and concluded that she had a mild limitation, despite her testimony that she lost concentration after 30 minutes. (Tr. 16-17). He reached this conclusion based on the fact that she could cook, do chores, and shop; she had lost over 50 pounds in one year; in July, 2011, she reported she was able to walk her dog,

run errands, cook, play games, perform light gardening, read and sew; and she denied any problems with memory, concentration, or completing tasks, and stated that she could handle moderate stress and changes in routine. (Id., citations omitted).

Second, in developing her RFC, the ALJ addressed Shanda's testimony that she could not work due to difficulties with lack of concentration, depression, and the pain in her back knees, right shoulder, and neck, which allegedly limited her ability to use a computer for more than 30-45 minutes or to perform too many repetitive motions. (Tr. 18-19).

As required by 20 C.F.R. § 404.1523,[28] the ALJ indicated that he had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ." (Tr. 18) (emphasis added). Further, the ALJ stated that in determining Shanda's RFC, he had "accounted for her obesity, cervical myelopathy, bilateral knee degenerative joint disease, and lumbar degenerative disc disease . . . ." (Tr. 20).

The ALJ then went on to explain in great detail why he did not find Shanda's testimony and the severity of her alleged limitations to be fully credible, including her history of improvement of symptoms resulting from surgeries, treatment, physical therapy, steroid injections for her right shoulder, knees, back and neck, along with her significant weight loss, her work history, and daily activities. (Tr. 19-20). The ALJ's

---

[28]    Under the Social Security Act, the Commissioner must "consider the combined effect of all . . . impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. "Thus, the fact that each impairment standing alone is not disabling does not conclude the inquiry into whether an applicant is disabled. The ALJ must consider the impairments in combination and not fragmentize them in evaluating their effects." Delrosa v. Sullivan, 922 F.2d 480, 484 (8th Cir. 1991) (citation omitted).

analysis is supported by the record as a whole.  For example, in October, 2009, following the surgery to her right shoulder in April, 2009, Dr. Schnell found excellent strength with external and internal rotation, slightly tender AC joint, and mildly restricted range of motion in her right shoulder.  (Tr. 255).  In March, 2011, Dr. Schnell observed full painless range of motion and excellent strength in the right shoulder.  (Tr. 247).  In July, 2011, following her bilateral knee arthroscopies, Shanda exhibited mildly warm knees with diminished range of motion.  (Tr. 401).  However, Dr. Schnell found nothing meriting surgery and recommended continued weight loss management.  (Id.).  The ALJ also noted the treatment reports of Dr. Heyer, who found improved knee pain and "great relief" from lumbar steroid injections.  (Tr. 468, 469).

Likewise, the record reflected that Shanda demonstrated improved symptoms with physical therapy.  In September, 2009, Shanda was discharged from right shoulder physical therapy after exhibiting nearly full passive range of motion.  (Tr. 349).  In February, 2011, Shanda was discharged from physical therapy for her knees after exhibiting minimal pain during her last visit and meeting most of her rehabilitation goals. (Tr. 361).  Between April and June, 2011, Shanda underwent physical therapy for her left upper back and neck pain.  (Tr. 369, 372).  At the time of discharge, Shanda was able to complete 30 minutes of therapeutic exercise with minimal to no pain and "was feeling she could manage her symptoms independently."  (Tr. 372).  In 2012, Shanda underwent physical therapy for low back, neck and shoulder pain.  (Tr. 410, 417). Shanda was discharged from physical therapy on August 15, 2012, after meeting all of her goals.  (Tr. 417).  Shanda indicated that she "was feeling much better" and could manage on her own with an independent exercise program.  (Id.).

As noted by the ALJ, in February, 2013, Dr. Wallerstein had observed limited cervical range of motion, minimally limited shoulder flexion, mild to moderately limited shoulder abduction, mildly limited lumbar extension and mobility, mild balance instability while changing direction, smooth gait, negative straight leg raise, and no significant weakness or sensory deficits.  (Tr. 19-20, citing Tr. 478-82).

The ALJ also properly considered and rejected Dr. Viren's opinion that Shanda was disabled by her pain.  The ALJ explained that Dr. Viren's opinion "fail[ed] to cite any objective clinical findings in support and is not consistent with [Shanda's] documented improvement with physical therapy and steroid injections."  (Tr. 21).  Given the lack of objective support and inconsistency with other medical evidence, the ALJ properly discounted Dr. Viren's opinion.  "An ALJ may . . . give less weight to a conclusory or inconsistent opinion by a treating physician."[29]  Bernard, 774 F.3d at 487 (citing Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007)).  Here, Dr. Viren's opinion that Shanda was "disabled by her pain" is a conclusory assessment of Shanda's disability status.[30] Accordingly, the ALJ did not err in assigning little weight to Dr. Viren's findings.

---

[29]    As a practical matter, opinions by medical sources that an individual is disabled are entitled to no weight at all, as the issue of whether a claimant is disabled is reserved solely to the Commissioner.  See 20 C.F.R. § 404.1527(d)(1).

[30]    Shanda noted that Dr. Viren had stated:

> [Shanda] has had chronic pain issues including herniated disk disease in her lower back, left hip pain and arthritis, left ankle pain and arthritis status post surgery, and bilateral knee pain. . . . She has a difficult time getting up, moving around, lifting, or walking.  She is also not able to sit for any period of time because of her back pain.  She has to get up and move around at least every 15 minutes.

Pl.'s Mem., p. 23 (citing Tr. 229).  However, as the Commissioner pointed out, Dr. Viren made this statement in the section of her report labeled "SUBJECTIVE," which indicates

The ALJ also discussed the inconsistencies between Shanda's claim of disabling pain with her work history and daily activities.  The ALJ noted that Shanda's work as a home health aide for nearly two years after her alleged disability onset date – a job which required her to cook, clean, do laundry, assist clients with bathing and dressing, and transferring and lifting clients weighing 100 pounds or more two to three times a shift – "suggests she was capable of working despite her symptoms."  (Tr. 20, citing Tr. 144-155).  The ALJ also noted that Shanda reported working at home and taking computer courses until her alleged shoulder injury in September, 2010; however, the record reflected no shoulder injury at this time.  (Id., citing Tr. 478-82).  Therefore, the ALJ correctly concluded that this inconsistency called into question her credibility.

Likewise, the ALJ further indicated that Shanda's claim of disabling pain was belied by her ability to engage in a range of activities despite her impairments, such as cooking, shopping, light housekeeping, laundry, light gardening, sewing, reading, playing games, and visiting her parents in the nursing home, (id., citing Tr. 166-73), as well as exercising with weights and walking her dog 30 minutes a day.  (Id., citing Tr. 455, 470).

Finally, the ALJ considered the effect of Shanda's depression in determining Shanda's functional limitations.  In step four of the analysis, the ALJ stated:

> As for [Shanda's] depression, for the past few years, she has had relationship problems, does not feel like doing anything, and is upset all the time.  She did not seek treatment for depression until recently because she lost weight, did not want to gain it back, and had relationship issues.  She is not

---

that this was Shanda's own account of her impairments.  The ALJ is entitled to give less weight to an opinion based on subjective complaints rather than objective medical evidence.  Cline v. Colvin, 771 F.3d 1098, 1104 (8th Cir. 2014) (citations omitted).

> yet on psychotropic medications because she is concerned
> about possible adverse reactions.

(Tr. 19). Further, in weighing the opinion evidence, the ALJ indicated that he gave little weight to the State Agency consultants who found no mental medically determinable impairment, in light of newer evidence that indicated the medically determinable impairment of depression.   (Tr. 21).   Given this discussion, contrary to Shanda's position, there is no indication that the ALJ ignored Shanda's depression merely because it was non-severe.

Based on the credibility analysis performed by the ALJ in determining the RFC for Shanda, the Court finds that the ALJ properly evaluated Shanda's complaints of pain and the combined effects of her severe physical impairments and depression, and explained why he was not fully crediting the alleged severity of her limitations, including her claim that she could not concentrate more than 30 minutes at a time.   This conclusion is particularly compelling when not one physician, treating or otherwise, opined that Shanda's concentration was limited in any way or that her various physical impairments and depression, singularly or in combination, impacted her concentration. Lacking such evidence, the ALJ was not required to explain with any greater specificity how each impairment affected Shanda's ability to maintain concentration.  Cf. Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) ("After separately discussing Browning's physical impairments, affective disorder, and complaints of pain, as well as her daily level of activities, the ALJ found that her 'impairments do not prevent [her] from performing her past relevant work.' 'To require a more elaborate articulation of the ALJ's thought processes would not be reasonable.'") (citation omitted).

For all of these reasons, the Court finds no error with respect to the ALJ's assessment of Shanda's ability to maintain concentration necessary to perform her past relevant work as a computer-aided drafter.

## VIII.  CONCLUSION

The Court concludes that the ALJ's decision to deny Shanda's application for SSI benefits cannot be sustained.  The ALJ failed to address or even mention the opinions of Drs. Anderson, Phibbs and Wallerstein that Shanda was limited in her ability to frequently extend her arm away from her body.  The ALJ should have discussed these limitations because the VE had testified that they would prevent Shanda from performing her past work as a computer-aided drafter.  And, as previously noted, a person of advanced age (such as Shanda), who is limited to sedentary work, must be found disabled if she cannot perform past relevant work.  Moreover, the record contained no medical reports directly contradicting the limitations given by Drs. Anderson, Phibbs and Wallerstein.  However, with respect to Shanda's subjective complaints of pain and limitations in concentration, the Court finds that the ALJ's conclusions were supported by substantial evidence in the record and should not be disturbed.

Accordingly, it is recommended that Shanda's motion for summary judgment be granted in part and denied in part.  Shanda's request for an immediate award of benefits should be denied.  However, the ALJ's decision should be vacated.  It is also recommended that the Commissioner's motion for summary judgment be denied, and that this case be remanded for further administrative proceedings.

If this Report and Recommendation is adopted, on remand, the ALJ should be directed to do the following:

First, the ALJ must fully address the opinions of Drs. Anderson, Phibbs and Wallerstein, and make a determination as to Shanda's ability to extend her arm away from her body.

Second, the ALJ must determine Shanda's RFC at step four in light of the fully developed record, including the weight assigned to the opinions of Drs. Anderson, Phibbs and Wallerstein regarding Shanda's ability to engage in reaching out from her body.

Third, because the hypothetical questions posed to the vocational expert may have been based upon a faulty determination of Shanda's RFC, the VE's answers to those questions cannot constitute sufficient evidence that plaintiff was able to engage in substantial gainful employment.  See Cox, 160 F.3d at 1207.  Consequently, if the Commissioner revises the final RFC determination, new testimony from a VE should be solicited in order to determine whether, at step four of the evaluation process, Shanda can perform her former position as computer-aided drafter.  See Jenkins v. Apfel, 196 F.2d 922, 925 (8th Cir. 1999) (where a vocational expert's opinion is predicated on a faulty RFC determination, the ALJ cannot rely on that opinion); Nevland, 204 F.3d at 858.

## IX.    RECOMMENDATION

For the reasons set forth above, IT IS HEREBY RECOMMENDED that

1.    Plaintiff's Motion for Summary Judgment [Docket No. 8] be **GRANTED** in part and **DENIED** in part;

2.      Defendant's Motion for Summary Judgment [Docket No. 10] be **DENIED**;

3.      The case be remanded for further proceedings consistent with this decision.


Dated:      June 22, 2015

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

### NOTICE

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 6, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.